**Wallace Glenn ROBERTS, Jr., Plaintiff/Appellant,**

v.

**ROBERTSON COUNTY BOARD OF EDUCATION, Jerome Ellis, Superintendent of Schools, Steve Moss, and William Ballard, Defendants/Appellees,**

v.

**William Edward YOUNT, Third-Party Defendant.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 11, 1985.

Permission to Appeal Denied by Supreme Court June 17, 1985.

Robert A. Anderson, Weeks & Anderson, Nashville, for plaintiff/appellant.

James E. Walton, Walton & Jones, Springfield, for Robertson County Bd. of Educ., defendant/appellee.

Jere Lee, Mac Robinson, Dodson, Harris, Robinson & Aden, Nashville, for Steve Moss and William Ballard, defendants/appellees.

Tracy D. Shaw, Nashville, for William Edward Yount, third party defendant.

OPINION

KOCH, Judge.

Wallace Glenn Roberts, Jr. suffered a serious head injury on December 17, 1976, during a vocational agriculture class at Greenbrier High School when a fellow student, William Edward Yount, asked him for assistance in using a power driven drill press. He filed this action on October 22, 1980, in the Circuit Court for Robertson County pursuant to Tenn.Code Ann. § 29–20–101 et seq. [the "Tennessee Governmental Tort Liability Act"] against the Robertson County Board of Education as well as the county school superintendent, the principal of Greenbrier High School, and his vocational agriculture teacher, Billy Ross Ballard. On April 2, 1981, the defendants filed a third-party complaint in accordance

with Tenn.R.Civ.P. 14.01 seeking contribution and indemnity from Yount on the theory that it was his negligence that caused Roberts' injuries.[1] In accordance with Tenn.Code Ann. § 29–20–307, the trial court heard the proof without a jury on December 8 and 9, 1983. At the conclusion of the proof, the trial court dismissed Roberts' action after determining that Mr. Ballard had not breached the duty of care he owed to his students and that Yount's intervening negligent acts were the proximate cause of Roberts' injuries. Roberts has perfected this appeal and now takes issue with the trial court's refusal to grant a directed verdict in his favor and with the trial court's determination that the defendants did not breach their legally imposed duty of care.

■■■ The trial court heard this case without a jury. Thus, our review is governed by Tenn.R.App.P. 13(d) which directs us to review the record de novo according the trial court's findings of fact a presumption of correctness. Accordingly, we will affirm the trial court's decision unless an error of law affecting the result has been committed or unless the evidence preponderates against the trial court's findings of fact. *Willis v. Smith,* 683 S.W.2d 682, 687–88 (Tenn.App.1984); *Haverlah v. Memphis Aviation, Inc.,* 674 S.W.2d 297, 300 (Tenn.App.1984); and *Summit Hill Associates v. Knoxville Utilities Board,* 667 S.W.2d 91, 96 (Tenn.App.1983). In conducting our review of the trial court's decision, we are also mindful that the trial court's findings based upon its own determination of the credibility of the witnesses and upon disputed evidence should be given great weight by this Court and should not be disregarded unless there is clear, concrete, and convincing evidence to the contrary. *APCO Amusement Co. v. Wilkins Family Restaurants of America, Inc.,* 673 S.W.2d 523, 529 (Tenn.App.1984), and *W.F. Holt Co. v. A & E Electric Co.,* 665 S.W.2d 722, 733 (Tenn.App.1983).

---

1. On December 8, 1983, the day the trial commenced, the trial court, *sua sponte,* severed the

third-party action against Yount.

Determinations concerning negligence, contributory negligence, proximate cause, and foreseeability present unique problems when they are made by a trial judge sitting without a jury. Usually, these determinations are within the exclusive domain of the jury. *City of Elizabethton v. Sluder,* 534 S.W.2d 115, 117 (Tenn.1976), and *Frady v. Smith,* 519 S.W.2d 584, 586 (Tenn.1974). However, they involve not only factual matters but also mixed considerations of logic, common sense, public policy, and precedent. *Wyatt v. Winnebago Industries, Inc.,* 566 S.W.2d 276, 280 (Tenn.App. 1977), and *Mullins v. Seaboard Coastline Railway Co.,* 517 S.W.2d 198, 201 (Tenn. App.1974).

While we have determined that the evidence does not preponderate against the trial court's findings of fact with regard to the occurrences that gave rise to this action, we do not concur with its determination that Mr. Ballard had fulfilled his duty of care owed to his students or that the county board of education should be relieved from liability because of Yount's intervening actions. Therefore, we reverse the judgment of the trial court.

## I.

### *The Facts*

Wallace Glenn Roberts, Jr. was a fourteen year old freshman at the Greenbrier High School in 1976. He elected to enroll in the school's Vocational Agriculture I class that was taught by Billy Ross Ballard. Mr. Ballard had taught this class at Greenbrier High School since 1960. There were twenty-three students enrolled in this class when it began in the middle of August, 1976. The class met one hour each day during the school week.

According to the rules of the State Board of Education, Vocational Agriculture I is one of two basic courses which students must take in the ninth grade in order to be eligible to enroll in more specialized areas.[2] It is intended to acquaint the students with basic farm techniques. In the words of Mr. Ballard, it was intended to train students in

any general area of shop dealing with anything that he is going to come in contact with the rest of his life I guess you would say around the home, around the farm, around the shop.

This course was taught in a separate modular building in back of the old Greenbrier High School. This building contained a classroom outfitted with tables and chairs, a tool room, two restrooms, Mr. Ballard's office, and an L-shaped shop area. There were a number of entrances to the shop area from the interior rooms and one primary outside entrance separated from the shop area by a hallway running between the tool room, the classroom, and the two restrooms.

Mr. Ballard testified that he taught this course in 1976 in much the same way he had taught it in past years. He did not rely upon a written lesson plan but generally relied upon his memory and his "philosophy on learning the students."[3] In this regard, Mr. Ballard testified that

I just go historically day to day. After so many years, it just sort of falls in. And there are some old lesson books there, maybe ten, twelve years old. Every once in a while you will thumb through and pick up where you left off.

---

**2.** See 3 Tenn.Admin.Comp. ch. 0520–3–1–.03(2)(a)2(i) & (ii).

**3.** The rules of the State Board of Education define the duties of a vocational agriculture instructor as follows:

The teachers of vocational agriculture will conduct courses in the broad field of agriculture under the direction of local education officials and under the technical supervision of the Division of Vocational Education.

They shall be responsible for classroom instruction, laboratory, shop, and other educational experiences required as a part of the instructional program. The teacher shall be responsible for planning, developing, and supervising and/or coordinating the supervised work experiences of the students throughout the year.

3 Tenn.Admin.Comp. ch. 0520–3–1–.03(2)(b)1(i).

Mr. Ballard also described the normal progression of subjects in his class. He began with a discussion about the activities of the Future Farmers of America. Then he turned to beef production, then to shop, and finally to various types of crops. During the shop portion of the class, Mr. Ballard stated that he first taught the use of oxyacetylene and the arc welder, then the band saw, then the wood lathe, and then the drill press.

Mr. Ballard did not believe that the drill press was a very difficult piece of equipment to use, although he did state that some of its uses were more "delicate" than others. He demonstrated the use of this machine to his students by showing how it could be used to drill holes in metal and then how it could be fitted with a router bit for use in drawing letters and words in wood.

Mr. Ballard also testified that he taught "safety" in each one of his classes, although the record is not clear concerning the exact nature of the instruction Roberts' class received. This instruction took several forms including handouts, films, signs posted in the shop, and shop demonstrations on each piece of equipment. It also appears to have involved general safety rules as well as specific operational rules with regard to each piece of equipment.

While Mr. Ballard could not remember whether he passed out a written sheet of his safety rules to his Vocational Agriculture I class in 1976, he stated that these rules were a matter of general knowledge among his students. Mr. Ballard's three main general safety rules were: (1) that the machinery could not be operated when he was not in the shop;[4] (2) that "horseplay and horsepower don't mix"; and (3) that students should not talk to or distract persons who were working with the machinery. He also stated that there were other general rules with regard to the use of protective eye wear and disconnecting a piece of equipment while it was being adjusted. Students were also told not to try to do anything on a piece of equipment that they had not done before without asking Mr. Ballard first or without his direct supervision.

Mr. Ballard also testified that in addition to these general safety rules, there were a number of specific safety rules with regard to the operation of the drill press that he reviewed with his students when he demonstrated the use of each piece of equipment. A number of these operational rules were also included in a sign posted on the wall near the drill press which contained a list of eight safety precautions.[5]

Mr. Ballard and his students also testified that certain students were given more latitude to work with machinery than others. Mr. Ballard stated that this was based on each student's ability and responsibility demonstrated in the way that he used each piece of equipment. While these students were not exempted completely from complying with Mr. Ballard's safety rules, they had more latitude to use the machinery without Mr. Ballard's direct supervision.

---

**4.** The exact substance of this rule is not free from doubt. The shop students who testified had various understandings of the rule, and Mr. Ballard himself testified of two different versions. At one point, he stated that the machines were not to be used when he was not in the *building.* At another point, he testified that the machines were not to be used when he was not in the *shop area* itself. In either case, it was apparently Mr. Ballard's practice to instruct his students to turn off the machines when he did not want them to be used. The students were not instructed that it was their responsibility to keep track of Mr. Ballard's whereabouts.

**5.** Three of these posted precautions relevant to this case are:

Safety Precautions

\*   \*   \*   \*   \*   \*

2. Before placing the drill or bit in the drill press chuck, check the speed by starting the motor. Then, if necessary, adjust for proper speed. Use a low speen [sic] for large bits, medium speed for medium-sized bits; and higher speed for small bits and drills.

\*   \*   \*   \*   \*   \*

4. Material of a size and shape which might be seized by the turning drill must be clamped securely to the drill press table. When in doubt, ask the instructor for advice.

\*   \*   \*   \*   \*   \*

6. Keep hands clear of the line of travel of the bit or drill.

While Mr. Ballard was generally complimentary of Yount's work, the record is not clear concerning whether Yount was considered one of these better students.

The class in which Roberts and Yount were students received its group instruction in the use of the drill press in late October or early November, 1976. This instruction included a demonstration wherein Mr. Ballard showed students how to drill holes in metal and how to carve letters in wood using a short router bit. Mr. Ballard could not state whether either Roberts or Yount viewed this demonstration and did not testify to any steps he took to make sure that each student attended the demonstration or understood the basic techniques he was teaching. Yount testified, in fact, that he was not directly involved in Mr. Ballard's demonstration of the drill press because he was using the welding equipment at the time in another area of the shop. There is no evidence in this record that this demonstration of the drill press or any other instruction included warnings to the students of the dangers attendant to more complicated uses of the drill press or instructions concerning how students should help each other use the drill press.

On December 17, 1976, the last school day before the Christmas vacation, Yount desired to use the drill press to drill a hole through a fourteen inch, cylindrical piece of wood he was fashioning into a lamp base he intended to give as a Christmas present. Mr. Yount had only seen the drill press used to drill holes in metal and to carve names in wood. The work he wanted to do was not one of the basic uses of the drill press that had been covered in Mr. Ballard's demonstration conducted a month earlier. Yount had never received instruction concerning the use of the drill press to drill holes in larger pieces of wood. Like-

wise, he had never tried to do this before and had never seen anyone else try to use the drill press in this way. Mr. Ballard testified that this use required a more elaborate setup and that it could be dangerous if the drill press was not set up properly.

Yount talked to Mr. Ballard about what he wanted to do. Mr. Ballard understood from this conversation that Yount was eager to do this work that day because he wanted to take the lamp base home. This job could not be done using the drill bits that the students were accustomed to using. It required a much longer drill bit that Mr. Ballard kept in his desk drawer in his office.[6] Even though the students were not making full use of the shop that day, Mr. Ballard took this special drill bit from his desk drawer and gave it to Yount. While there is some disagreement concerning Mr. Ballard's instructions at this point, Mr. Ballard testified that he instructed Yount to wait before he started to use the drill bit because he wanted to be present to supervise the student's work.[7] Yount went into the shop and set up the drill press as best he knew how. He then waited for Mr. Ballard.

Mr. Ballard was not in the shop area at that time, nor did he follow Yount into the shop. He was in another part of the building. He had promised to give his students free soft drinks that day, and at the time Yount was ready to work on his lamp base, Mr. Ballard was near the outside entrance to the shop building where he was moving the soft drink machine into the classroom area. The drill press could not be seen from where Mr. Ballard was located near the outside door.

Yount waited for approximately ten minutes for Mr. Ballard to return to the shop. There were other students using shop machinery during this time. When Mr. Ballard did not come in, Yount asked his class-

**6.** It is not clear why this bit was kept in Mr. Ballard's desk drawer. At one point Mr. Ballard stated that he kept it there because it was the only one he had. Later he stated he had other long drill bits. However, it is reasonable to conclude that this particular bit was not generally available to students and that they did not

receive instruction concerning its use as a part of the basic curriculum.

**7.** Yount testified that Mr. Ballard told him "[t]o go ahead and he [Mr. Ballard] would be in in a minute."

mate, Roberts, to assist him in drilling a hole in the lamp base. Roberts had been helping another classmate use a hand saw, and this was the first time he was aware that Yount desired to use the drill press. He was not aware that Yount had talked with Mr. Ballard about this job and thus, was not aware of any instructions that Mr. Ballard might have given Yount. He was just helping a friend. Roberts had never been instructed or warned concerning the danger of what Yount was doing or the manner in which people could be injured when using a longer drill bit.

At Yount's request to hold the piece of wood while the hole was drilled, Roberts knelt down next to the drill press and held the piece of wood firmly in both hands. His face was approximately ten to twelve inches away from the drill itself. Yount turned on the drill, and in an instant, the long drill bit deflected at an angle of approximately forty-five degrees striking Roberts on the right temple. The drill bit caused a long cut and skull fracture from Roberts' right temple to behind his right ear. He fell back immediately from the machine, and other students came to his aid and carried him to Mr. Ballard's office. Mr. Ballard did not know what had happened until one of the students came to get him. Mr. Ballard and the school principal then transported Roberts to the hospital.

The neurosurgeon who treated Roberts testified that he made an excellent recovery, although he stated that Roberts would have some minor permanent problems due to the weakness in his skull caused by the fracture. The scarring from the wound is not visible because it is above Roberts' hairline. The neurosurgeon's opinion was that this injury resulted in a five percent disability to the body as a whole.[8]

Mr. Ballard testified later that Yount had not set up the drill press properly because he had not reduced the drill bit's speed and had not properly clamped the cylindrical piece of wood in place before he started.

Mr. Ballard stated that the drill press would have been properly adjusted had he been supervising Yount and that this accident would not have happened had he been in the shop when Yount was working on his lamp base.

## II.

### *The Negligence of the School Officials*

■ Roberts alleged in his complaint that his injury was the result of the negligence of his vocational agriculture teacher, the local school administrators, and the county school board. As in all negligence actions, he must prove in order to recover that the defendants had a legally recognized duty to him, that this duty was breached, and that this action or failure to act was the proximate cause of his injury. *Shouse v. Otis*, 224 Tenn. 1, 7, 448 S.W.2d 673, 676 (1969), and *Ruth v. Ruth*, 213 Tenn. 82, 86, 372 S.W.2d 285, 287 (1963).

■ Any examination of a negligence action properly begins with the trial court's determination whether the defendant owed a duty to the plaintiff. *Lancaster v. Montesi*, 216 Tenn. 50, 55, 390 S.W.2d 217, 220 (1965). The trial court has the exclusive responsibility to determine whether the law will recognize a duty imposed on the defendant for the plaintiff's benefit. *Dill v. Gamble Asphalt Materials*, 594 S.W.2d 719, 721 (Tenn.App.1979). If the trial court determines that the defendant owes no duty to the plaintiff, then the case draws to a close. If, however, the trial court determines that a duty exists, then it may proceed to determine whether the defendant's actions or failure to act breached this duty and whether these actions or inactions were his proximate cause of the plaintiff's injury.

The trial court in this case determined that Mr. Ballard had a duty "to properly supervise and properly instruct" his stu-

---

**8.** Roberts had already lost the sight in his right eye in an automobile accident that occurred

when he was a child.

dents.[9] While we agree with this generalized determination as far as it goes, we find it necessary to define this duty more precisely and to describe carefully the scope of the teacher's standard of care.

■ Teachers and local school districts are not expected to be insurers of the safety of students while they are at school. *Ankers v. District School Board of Pasco County,* 406 So.2d 72, 73 (Fla.App.1981). Nor are teachers expected in every instance to supervise all the activities of all students at all times. *Sheehan v. St. Peter's Catholic School,* 291 Minn. 1, 188 N.W.2d 868, 870 (1971). However, most courts having occasion to consider cases involving injuries to students while in shop class have determined that teachers, and through them their local school systems, are required to exercise such care as ordinarily reasonable and prudent persons would exercise under the same or similar circumstances. Thus, the Louisiana Court of Appeal has held:

> The standard of care for school teachers and administrators is that of a reasonable person in such a position acting under similar circumstances.
>
> *Lawrence v. Grant Parish School Board,* 409 So.2d 1316, 1318 (La.App.), *cert. denied,* 412 So.2d 1110 (La.1982).

See also *Fallin v. Maplewood—North St. Paul District No. 622,* 362 N.W.2d 318, 321–22 (Minn.1985); *Morris v. Ortiz,* 103 Ariz. 119, 437 P.2d 652, 654 (1968); *Swartley v. Seattle School District No. 1,* 70 Wash.2d 17, 421 P.2d 1009, 1011 (1966); *Izard v. Hickory City Schools Board of Education,* 315 S.E.2d 756, 757 (N.C.App. 1984); and *Matteucci v. High School District No. 208, County of Cook,* 4 Ill.App.3d 710, 281 N.E.2d 383, 386 (1972).[10]

The Tennessee Supreme Court has adopted the reasonable person standard in other cases involving the safety of students. In a case where a high school student was injured when she fell on the steps of a school bus, the Tennessee Supreme Court held the school system to the standard of "reasonable and ordinary care under the circumstances." *Hawkins County v. Davis,* 216 Tenn. 262, 267, 391 S.W.2d 658, 660 (1965). However, our courts have also recognized that this standard of care can be related directly to the nature of the persons to whom the duty is owed and the circumstances giving rise to the duty. The Tennessee Supreme Court has recognized, for example, that an adult's standard of care to children should be tempered by the recognition of children's youthful impulsiveness and inexperience. *Townsley v. Yellow Cab Co.,* 145 Tenn. 91, 93–94, 237 S.W. 58 (1922). Likewise, this Court has recognized that a person who deals with inherently dangerous instrumentalities has a duty to exercise caution commensurate with the dangers involved. *International Harvester Co. v. Sartain,* 32 Tenn.App. 425, 454–455, 222 S.W.2d 854, 867 (1948). Thus, with regard to the duty of care owed by school bus drivers to students placed in their charge, the Tennessee Supreme Court held:

> Reasonable and ordinary care under the circumstances, when one of the circumstances is that the care of a child of tender years is entrusted to the school bus driver, requires that the driver exercise special care proportionate to the age of the child and its ability, or lack of ability, to care for itself.
>
> *Hawkins County v. Davis,* 216 Tenn. 262, 267, 391 S.W.2d 658, 660 (1965).

■ Based upon these precedents, we find that a high school vocational teacher has the duty to take those precautions that any ordinarily reasonable and prudent person would take to protect his shop students from the unreasonable risk of injury. The extent of these precautions must be deter-

---

**9.** The Tennessee Supreme Court has recognized in general terms that educational institutions may be liable for negligence in furnishing inadequate or improper instruction or supervision. *DeMauro v. Tusculum College, Inc.,* 603 S.W.2d 115, 120 (Tenn.1980).

**10.** See also W. Prosser, *Handbook of the Law of Torts* § 53, at 324 (4th Ed.1971) and Annot., 35 A.L.R.3d 758 § 6[a] (1971).

mined with reference to the age and inexperience of the students involved, their less than mature judgment with regard to their conduct, and the inherently dangerous nature of the power driven equipment available for their use in the shop. In order to discharge this duty, it is incumbent upon a teacher, at a minimum, to instruct his students in the safe and proper use of the equipment, to warn the students of known dangers, and to supervise the students to the extent necessary for the enforcement of adequate rules of shop safety.

Once the trial court has determined that the defendant was under a duty to protect the plaintiff against the event that did, in fact, occur, then it must be proven that the defendant's actions or failure to act constituted a breach of this duty. This second element of proof in a negligence case usually requires a factual determination that can only be made upon the unique facts of each case.

■ The final element of proof in a negligence action is the issue of causation. This is the ultimate question. *Lancaster v. Montesi*, 216 Tenn. 50, 56, 390 S.W.2d 217, 220 (1965). A defendant in a negligence action cannot be found liable unless it has been determined that his conduct was the proximate cause of the plaintiff's injuries. While the proximate cause concept has been described in many ways, the Tennessee Supreme Court has described proximate causation as

[t]hat act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another which, if it had not happened, the injury would not have been inflicted.

*Tennessee Trailways, Inc. v. Ervin*, 222 Tenn. 523, 528, 438 S.W.2d 733, 735 (1969).

See also *Shouse v. Otis*, 224 Tenn. 1, 8, 448 S.W.2d 673, 676 (1969). A defendant's conduct will be regarded as the proximate cause of the plaintiff's injury if it was the "procuring", "efficient", or "predominant" cause of the injury. *Kroger Co. v. Giem*, 215 Tenn. 459, 471, 387 S.W.2d 620, 626

(1964), and *DeRossett v. Malone*, 34 Tenn. App. 451, 475, 239 S.W.2d 366, 377 (1950). As long as the defendant's conduct is a substantial factor causing the injury, it need not be the sole cause or even the last act prior to the injury. *Lancaster v. Montesi*, 216 Tenn. 50, 57, 390 S.W.2d 217, 221 (1965), and *Kroger Co. v. Giem*, 215 Tenn. 459, 471, 387 S.W.2d 620, 626 (1964).

■ However, there can be more than one proximate cause for an injury. *Stokes v. Leung*, 651 S.W.2d 704, 708 (Tenn.App. 1982). Thus, this Court has recognized that

The rule is well established in this State that if an injury occurs from two causes, both due to the negligence of different persons, but together constituting an efficient cause, all persons whose acts contribute to the injury are liable therefore, and the negligence of one does not excuse the negligence of the other.

*Nichols v. Givens*, 49 Tenn.App. 653, 661, 358 S.W.2d 480, 483 (1962).

Thus, the Tennessee Supreme Court has held that a person injured by the concurrent negligent acts of two parties can recover from either or both parties. *Schoenly v. Nashville Speedways, Inc.*, 208 Tenn. 107, 113, 344 S.W.2d 349, 351 (1961).

■ Foreseeability is also an essential element of the proof of proximate causation. *Ford Motor Co. v. Eads*, 224 Tenn. 473, 483, 457 S.W.2d 28, 32 (1970). If the injury giving rise to the action could not have been reasonably foreseen or anticipated, then there is no proximate cause. *Ray Carter, Inc. v. Edwards*, 222 Tenn. 465, 471, 436 S.W.2d 864, 867 (1969). However, this foreseeability requirement is not so strict as to require that a defendant must foresee the exact manner in which an injury takes place. The requirement is met as long as it has been determined that the defendant could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury occurred. *Wyatt v. Winnebago Industries, Inc.*, 566 S.W.2d 276, 281 (Tenn.App.1977).

With specific reference to the conduct of teachers, we do not impose upon them the duty to anticipate or foresee the hundreds of unexpected student acts that occur daily in our public schools. *Verhel v. Independent School District No. 709*, 359 N.W.2d 579, 586 (Minn.1984). However, like other courts, we have no hesitation in holding a teacher or local school system to the duty of safeguarding students while at school from reasonably foreseeable dangerous conditions including the dangerous acts of fellow students. *Swartley v. Seattle School District No. 1*, 70 Wash.2d 17, 421 P.2d 1009, 1013 (1966), and *James v. Charlotte-Mecklenburg Board of Education*, 60 N.C.App. 642, 300 S.E.2d 21, 24 (1983). See also Restatement (Second) of Torts §§ 302 & 303 (1963), and Annot., 36 A.L.R.3d 361 § 3 (1971).

Based upon our *de novo* review of this record, we conclude that the evidence supports a finding that Mr. Ballard was negligent and that his failure to furnish adequate instruction and supervision to his vocational agriculture students was the proximate cause of Roberts' injuries. There are four separate aspects of Mr. Ballard's conduct that support this conclusion. First, Mr. Ballard had a practice of permitting inexperienced freshman students to remain in the shop area unsupervised in the presence of fully operational power driven equipment which, if used improperly, could cause serious injury.[11] Second, there is no proof that Mr. Ballard ever instructed his students in the proper techniques for assisting others in operating shop machinery. Third, there is no proof

that Mr. Ballard ever gave his students any instruction concerning the ways a drill press could cause injury if it was not used properly. While there is proof that Mr. Ballard demonstrated two of the many ways that a drill press could be used, neither Mr. Ballard nor any of his students testified that any instruction was given concerning the other ways that a drill press, if improperly used, could cause injury. Fourth, Mr. Ballard gave Yount a drill bit knowing that he had never used the drill bit before and that he was eager to use it during that class period.

The evidence supports a conclusion that Mr. Ballard was aware that Yount did not know how to use the longer drill bit properly when he gave it to him and that Mr. Ballard knew that this drill bit could be dangerous if used improperly. Apart from his conceded general recognition that fourteen year old boys have a characteristic impatience and curiosity, Mr. Ballard also had direct knowledge that Yount intended to use the special drill bit at that time because this was his last opportunity to do so before Christmas vacation. Rather than keeping the drill bit and telling Yount that he would come into the shop area to supervise his work, Mr. Ballard gave Yount the instrument that caused Roberts' injury. Providing the drill bit to Yount, knowing at the time that the shop equipment was fully operable, that other students were working in the shop area without supervision, and that Yount was eager to use the drill bit constitutes a breach of Mr. Ballard's duty to supervise his students properly and provides a sufficient basis for a judgment in Roberts' favor.[12]

**11.** In holding that a shop teacher was negligent when he left his students unsupervised in the presence of inherently dangerous equipment, the Louisiana Court of Appeal noted:

> It had repeatedly been held that the fact that each student is not personally supervised every moment of each school day does not constitute fault on the part of the School Board or its employees. [citation omitted]. However, we are faced here with a failure not only to properly supervise, but to even be present, when students are engaged in the use of dangerous equipment.

*Lawrence v. Grant Parish School Board*, 409 So.2d 1316, 1319 n. 2 (La.App.1982).

**12.** While the availability or expense of more effective safety procedures does not bear upon the issue of negligence, other courts have noted that other safety procedures are available at minimal cost. *Lawrence v. Grant Parish School Board*, 409 So.2d 1316, 1320 (La.App.), *cert. denied*, 412 So.2d 1110 (La.1982). In this case for example, Roberts' injury would have been prevented had Mr. Ballard taken the simple precaution of not giving Yount a drill bit he did not know how to use or had Mr. Ballard adopted and enforced a rule prohibiting students from being in the shop when he was not present. The injury would also have been avoided had

## III.

### The School Board's Liability in Light of Yount's Conduct

The trial court also appears to have based its ruling on a finding that it was Yount's conduct, not Mr. Ballard's, that was the proximate cause of Roberts' injury. In this regard, the trial court stated in ruling from the bench that

Now, Mr. Yount is the one that set in motion the thing that caused injury to Mr. Roberts.

\*     \*     \*     \*     \*     \*

Now, Mr. Yount having initiated this procedure which ultimately injured Mr. Roberts, in my opinion, did so in direct disobedience and [sic] correct safety instruction that had been given to the particular warning or condition imposed by Mr. Ballard when the bid was given to Mr. Yount or when Mr. Yount asked for permission to use it, whichever it was.

While we make no determination with regard to Yount's negligence—an issue still to be decided—we do not find that his actions are independent, intervening causes sufficient in and of themselves to excuse the negligence of Mr. Ballard or the local school system.

We have already noted that a person whose negligent conduct causes a foreseeable injury will not be relieved from liability because of a negligent act of another. *Nichols v. Givens*, 49 Tenn.App. 653, 661, 358 S.W.2d 480, 483 (1962). This same principle has prompted the Tennessee Supreme Court to find that a school bus driver could be held liable for injuries to a student passenger who was hit by another vehicle immediately after she alighted from the school bus. The Court held:

Nor do we find substance in the defense of an intervening cause in that (1) it was the negligence of the truck driver in running against the child, or (2) the act of the child in running into the truck, which proximately caused the accident. But for the negligence of the defendant in failing to restrain or warn the child, the accident would not have occurred. Clearly then his neglect proximately contributed to the result.

A joint tort feasor, he is not absolved by the conduct of others jointly responsible. Any one of those responsible may be sued separately.

*Cartwright v. Graves*, 182 Tenn. 114, 134, 184 S.W.2d 373, 381 (1944).

The courts of other states have reached similar results with regard to students who have sustained injuries in shop class. See *DeBenedittis v. Board of Education of City of New York*, 271 App.Div. 886, 67 N.Y.S.2d 30, 31 (1946).

Mr. Ballard candidly conceded that Roberts would not have been injured had he been present in the shop supervising Yount's use of the drill press. We agree. This provides a basis, independent of any consideration of Yount's actions, to hold Mr. Ballard, and thus, the local school board,[13] liable for Roberts' injuries.

## IV.

### Roberts' Motion for a Directed Verdict

Roberts also insists that the trial court should have granted his motion for a directed verdict pursuant to Tenn.R.Civ.P. 50 made at the close of all the proof. We do not agree. Plaintiff's insistance upon this motion demonstrates his failure to ap-

Mr. Ballard been provided with the central ability to render all machines inoperable while he was not in the shop area.

13. Mr. Ballard, acting in his capacity as a teacher, was an agent of the Robertson County Board of Education. Thus, pursuant to Tenn.Code Ann. § 29–20–205, the County is liable for his negligent acts. We do not place much weight in the plaintiff's theory that various defendants breached their statutory duty to adopt and en-

force reasonable regulations regarding the teaching of the "art of safety." The proof showed at the time, the local school board had adopted the bare minimum requirements of the State Board of Education and that these requirements left each system with a great deal of flexibility to decide how safety would be taught. Likewise, we do not find that this record contains adequate proof to find that the school's principal, Steve Moss, was negligent.

preciate that this is a non-jury trial. Juries return verdicts, while courts render judgments. Thus, as Mr. Justice Brock has noted:

> Motions for a directed verdict are neither necessary nor proper in a case which is being tried without a jury.

> *City of Columbia v. C.F.W. Construction Co.*, 557 S.W.2d 734, 740 (Tenn. 1977).

This holding is clear and unmistakable, and the reasons for it are evident. In a non-jury case, the trial judge is the ultimate trier of the facts. Thus, in addition to seeking a "verdict" in a case where the trial court will render a "judgment," a litigant's motion for a directed verdict at the close of the proof is little more than a request that the trial court rule in its favor after reviewing the evidence in a light more favorable to its adversary than would otherwise be necessary.[14] Such a motion is out of place in non-jury trials and thus, was properly denied.

## V.

### Judgment for Roberts and Assessment of Damages

■ This case was decided on its merits by the trial court without a jury. Tenn.R. App.P. 13(d) and 36(a) direct this Court, in cases where it has been determined that the evidence preponderates against the findings of the trial court, to render the judgment that should have been rendered based upon the evidence and applicable law. *American Buildings Co. v. White*, 640 S.W.2d 569, 576 (Tenn.App.1982), and *Newberry v. Newberry*, 493 S.W.2d 99, 102–03 (Tenn.App.1973). In this regard, the Tennessee Supreme Court has held:

> If, in the judgment of the Court of Appeals, the evidence preponderates

against the finding of the trial court the presumption as to its correctness vanishes and the Court of Appeals must enter such judgment as it deems the preponderance of the evidence warrants.

> *Perry v. Carter*, 188 Tenn. 409, 411–12, 219 S.W.2d 905, 906 (1949).

While this decision was handed down prior to the advent of the Tennessee Rules of Appellate Procedure, the Advisory Commission Comments to these rules make it clear that they were intended to preserve the ability of the Court of Appeals to "grant whatever relief an appellate proceeding requires."

We have reviewed this record. The case was fully tried, and thus, no useful purpose would be served to put the litigants to the time and expense of a new trial. Based upon the proof in the record, we have already determined that Mr. Ballard, and through him the Robertson County Board of Education, was negligent in its instruction and supervision of Yount, Roberts, and their fellow students and thus, that they are liable for the injuries Roberts sustained on December 17, 1976, in his Vocational Agriculture I class.

■ The issue of damages remains. The record contains evidence that Roberts' family sustained approximately $4,225 in medical bills as a result of this injury. Further, Roberts himself was hospitalized for ten days and experienced moderate pain for some time thereafter. His surgical treatment required that his head be shaved, and thus, for some time after the accident, he was subjected to the ridicule and teasing of his peers. This embarrassment to a fourteen year old boy can be as painful as the injury itself. His treating physician also determined that this injury has caused a permanent weakening of his skull in the

---

**14.** A trial judge, sitting without a jury, weighs and evaluates the evidence following the close of the proof to determine whether the plaintiff has made out its case by a preponderance of the evidence. However, when a motion for a directed verdict pursuant to Tenn.R.Civ.P. 50 is made, the trial court takes the strongest legitimate view of the evidence in favor of the opponent to the motion, permits all reasonable infer-

ences to be drawn therefrom, and disregards all countervailing evidence. Clearly a plaintiff should prefer its case to be judged using the former rather than the latter standard. A motion for a directed verdict pursuant to Tenn.R. Civ.P. 50 should not be confused with a defendant's motion for dismissal at the close of the plaintiff's proof in a non-jury case pursuant to Tenn.R.Civ.P. 41.02(2).

area of the injury. While placing no limitation on Roberts' activities, his doctor determined that this injury has resulted in a five percent disability to the body as a whole. Based upon this testimony, we find that an award of $25,000 in damages is warranted.

For the reasons stated herein, the judgment of the trial court is reversed and the case is remanded with directions that a judgment in the amount of $25,000 be entered in favor of Wallace Glenn Roberts, Jr. and against Billy R. Ballard and the Robertson County Board of Education.

The costs of this cause are taxed against the Robertson County Board of Education.

TODD, P.J., and CANTRELL, J., concur.