IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 27, 2012 Session

**MISTY PHILLIPS, ON BEHALF OF HER MINOR SON JACOB GENTRY v. ROBERTSON COUNTY BOARD OF EDUCATION**

**Appeal from the Circuit Court for Robertson County**
**No. 11690     Ross H. Hicks, Judge**

**No. M2012-00401-COA-R3-CV - Filed September 11, 2012**

County appeals the trial court's decision finding the County liable for injuries sustained by a student with Asperger's syndrome in an altercation with another student. Finding that the evidence does not preponderate against the trial court's determination, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P. J., and FRANK G. CLEMENT, JR., joined.

Michael P. Mills, Brentwood, Tennessee, for the appellant, Robertson County Board of Education.

Jonathan A. Street, Nashville, Tennessee, for the appellee, Misty Phillips on behalf of her minor son, Jacob Gentry.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

In the 2005-2006 school year, Jacob Gentry was a seventh grader at White House Heritage School, part of the Robertson County school system. Jacob had a hard time adjusting to seventh grade and would have "meltdowns" when he cried inconsolably and needed to go to a quiet place to compose himself. He performed well academically.

That fall, Jacob's mother, Misty Phillips, had him evaluated by a clinical psychologist, Dr. Arie L. Nettles, at Vanderbilt. Based upon her evaluation, Dr. Nettles diagnosed Jacob with Anxiety Disorder and Adjustment Reaction with Asperger's Developmental Disorder.

Dr. Nettles recommended that Jacob's school "review IEP [individualized education program] recommendations and implement services deemed necessary." Ms. Phillips requested that an IEP be developed for Jacob, and the school responded by holding a support team meeting on November 10, 2005.

The original support team included Laura Pedigo, school psychologist; Kerry Baggett, principal; Ms. Phillips; several teachers (including a special education teacher); and Jacob. The team agreed to refer Jacob for further testing to determine his eligibility for special education services. Several interventions were instituted, including allowing Jacob to leave the classroom when he felt stressed. Test results revealed that Jacob did not meet state special education guidelines for any disability, but he qualified for the program for gifted students. At another support team meeting in February 2006, it was noted that Jacob's "social language skills" were a weakness. The team discussed and implemented further modifications to assist Jacob, including preferential seating and a card system to give him a way of signaling to a teacher that he was being bullied or felt stressed. In addition, Ms. Pedigo was to check on Jacob's progress weekly.

Dr. Nettles sent a letter to Ms. Pedigo and Principal Baggett on April 13, 2006 in which she stated that Jacob would need assistance with "social negotiation" and that "children and youth such as Jacob are often teased and bullied." She suggested a number of specific strategies to help Jacob at school.

On May 17, 2006, there was a physical altercation between Jacob and another child, W.K. When this incident occurred, the teacher, Amanda Knipfer (now Pass), was out of the room. W.K. hit Jacob in the eye with a book during the altercation, and Jacob sustained serious injuries to his left eye that necessitated four surgeries and left him legally blind in that eye.

Ms. Phillips filed this negligence suit against the Robertson County Board of Education, the superintendent, two principals, and a teacher in May 2007. (All of the individual defendants were later dismissed.) The case was tried without a jury on August 16 and 17, 2011. Testimony was heard from the following witnesses: Ms. Phillips, Jacob, Ms. Pedigo, W.K., Ms. Knipfer, a classmate who witnessed part of the incident, Margaret Thompson (assistant principal), and Principal Baggett.

The trial court entered a detailed memorandum opinion on December 13, 2011. In summarizing the trial testimony, we will quote from the trial court's opinion.

The school learned of Jacob's diagnosis of Asperger's at least by the November 10, 2005 support team meeting. Ms. Phillips and Jacob both testified that they reported

numerous instances of bullying and teasing to school officials and teachers. According to the testimony of Ms. Phillips, Principal Baggett, and Ms. Pedigo, Ms. Phillips "was constantly reporting such incidents [of bullying and teasing] to school officials and demanding that something be done." School officials denied observing the alleged bullying and teasing and asserted that Jacob's problems with other students were "mutual" or "a function of Jacob's inability to understand and interact appropriately with his peers." Ms. Pedigo "acknowledged that it is not uncommon for children with Asperger's to be considered 'bully magnets.'" School officials acknowledged that Jacob had "meltdowns" at school; during these episodes, he could not think rationally and was often unable to express to teachers or administrators what had happened.

The trial court determined that it was not necessary to resolve all of the conflicts in the testimony regarding whether bullying occurred and whether the school responded appropriately. It summarized the essential facts to be as follows:

> [T]he school system was aware that Jacob had Asperger's and the characteristics or indications that Jacob would exhibit as a result. These would include such things as appearing isolated, having difficulty reading social cues, having difficulty getting along with peers, and having problems socially. The school was aware that Jacob could exhibit meltdowns or other inappropriate behavior and actually observed and documented such behavior. The school was aware that he could be a "bully magnet." Whether or not the school observed Jacob being bullied or was able to verify all Jacob's accounts of bullying, it was nonetheless aware of his complaints and the validity of some of them.

Principal Baggett acknowledged that some of Jacob's complaints of bullying were corroborated and resulted in action against the other students involved. He did not know if the contents of Dr. Nettles's April 2006 letter were communicated to Jacob's teachers. The school system had a policy that students be under the supervision of school personnel at all times of the school day.

Ms. Knipfer began teaching at White House in the spring of 2006. She did not recall having problems with Jacob in class. Although she had heard about Jacob's Asperger's diagnosis during "water fountain talk" with other teachers, she did not recall being officially advised of any issues involving Jacob. The only accommodation for Jacob she knew about was the preferential seating. Ms. Knipfer did not recall seeing any communication from Vanderbilt about Jacob's special needs or reviewing Jacob's IEP. Ms. Knipfer knew about the school policy regarding supervision of students. On the day in question, however, she had an emergency and did not remember whether she had asked another teacher to supervise.

Ms. Thompson, the assistant principal, testified that she knew about complaints regarding other students bullying Jacob. She never saw Dr. Nettles's April 2006 letter. In her testimony, Ms. Thompson acknowledged that, at her deposition, she had stated that she believed she had sent W.K. to guidance for bullying. Ms. Thompson had sent some students through a bullying program because of interactions with Jacob.

In his testimony, W.K. stated that there was no teacher in the classroom when he and Jacob had the altercation at issue. He did not believe that the incident would have escalated as it did if a teacher had been in the room.

Both Ms. Phillips and Jacob testified that "W.K. had been identified as one of the students bullying Jacob in the many conversations and meetings that occurred between Ms. Phillips and/or Jacob and school officials." Principal Baggett, Ms. Thompson, and Ms. Pedigo, however, "testified that W.K. was never specifically identified as a student bullying or mistreating Jacob."

Based upon the testimony, the court found "that Jacob was a victim of bullying and that the school was on notice that the bullying was occurring." The court further found:

> Ms. Knipfer did not review Jacob's IEP, was not made aware of Jacob's special needs and circumstances by school officials, was never shown any of the information contained in Dr. Nettles['s] initial evaluation or April letter and did not follow school policy or the instructions of the principal and assistant principal concerning supervision of her classroom. . . . Further, the court finds that the failure of the other school officials to appropriately [disseminate] information concerning Jacob to those needing to know was also negligence. Had Ms. Knipfer known of the issues involving Jacob she may have made extra effort to be certain that the classroom was supervised by someone during her absence or sent Jacob out of the classroom as she left. The principal testified that Jacob should never have been left alone in a classroom without a teacher present because of his conditions and his complaints of bullying, yet this critical information was not given to Ms. Knipfer.

The trial court concluded that the incident in which Jacob was injured "was foreseeable; that it occurred as the result of the negligence of the Defendant and that the negligence of the Defendant was the proximate cause of the accident or injury." In a final order entered on January 13, 2012, the court entered judgment in favor of the plaintiff in the amount of $300,000.00.

STANDARD OF REVIEW

In a trial without a jury, we review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Moreover, we "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann,* 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn. 1999).

ANALYSIS

On appeal, the County argues that the physical conflict between Jacob and W.K. was not foreseeable and that the acts of the school employees were not negligent.

In a cause of action for negligence, a plaintiff must establish five elements: a duty of care owed by the defendant to the plaintiff, breach by the defendant of that duty of care, injury or loss, cause in fact, and proximate or legal cause. *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005); *Waste Mgmt., Inc. v. S. Cent. Bell Tel. Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997). Schools districts "are not expected to be insurers of the safety of students while they are at school." *Roberts v. Robertson Cnty. Bd. of Educ.*, 692 S.W.2d 863, 870 (Tenn. Ct. App. 1985). School districts do, however, have a duty to safeguard students while at school from "reasonably foreseeable dangerous conditions including the dangerous acts of fellow students." *Id.* at 872. The question of whether there has been a breach of the duty of care is an issue for the trier of fact. *West v. E. Tenn. Pioneer Oil Co.,* 172 S.W.3d 545, 552 (Tenn. 2005). Foreseeability, an essential component of proximate (or legal) cause, is an issue of fact, and the trial court's findings regarding foreseeability are, therefore, entitled to a presumption of correctness. *Cox v. State*, 844 S.W.2d 173, 178 (Tenn. Ct. App. 1992).

1.

The County argues that the physical conflict between Jacob and W.K. was not foreseeable so as to make the County's acts the proximate or legal cause of his injuries.[1]

---

[1]While foreseeability is also a consideration in determining whether a defendant's acts breached a duty of care, *see Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005), we will address the issue of foreseeability mostly in the context of proximate (or legal) cause since this is the main argument made by the County.

Foreseeability is an essential part of proving proximate (or legal) cause. *Roberts*, 692 S.W.2d at 871. If the plaintiff's injury "could not have been reasonably foreseen or anticipated," there is no proximate (or legal) cause. *Id.* There is no requirement that the defendant foresee the exact manner in which the injury took place; rather, it must be determined that the defendant "could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury occurred." *Id.*

The County argues that foreseeability must be based upon the history of the participants in a particular incident and that there is no evidence of prior incidents involving Jacob and W.K. As the plaintiff points out, the trial court did hear evidence supporting a prior history of incidents involving W.K. and Jacob. Ms. Phillips testified that W.K. was one of the six boys she identified by name to the school as bullying Jacob. Jacob and Ms. Phillips both testified that they told school officials or teachers about specific incidents involving W.K. shortly after they occurred. In its factual findings, the trial court noted that Ms. Thompson, in deposition testimony, stated that "she believed she had sent W.K. to guidance for bullying."

The County argues that the evidence does not support the trial court's finding about Ms. Thompson's testimony. At trial, plaintiff's counsel questioned Ms. Thompson about her deposition testimony:

Q. And you actually sent kids to this [bullying] program because of their interaction with Jacob; is that right?
A. I did.
Q. Okay. And you believe one of those kids you sent was [W.K.]?
A. Do I believe that? I don't know.
Q. Well, do you remember–again, if you will flip over for me to your deposition on page 32 and I said: "You did send some kids to the program." Uh-Huh.
    I said, "Okay, how many?" You said, "I thought, well, I don't know specifically, but after I saw there seemed to be a problem with momma, I sent several because I thought the more that have to go there the fewer that will want to play that game."
A. Uh-uh.
Q. And I said, it makes sense to me, was one of those [W.K.], and you said, I don't know specifically, but if I had to guess, I would say yes.
    So you thought at that time, that you actually did send W.K.?
A. And at this point in time I'm still saying–
    MR. MILLS [counsel for County]: Your Honor, I object. Read the entire answer. Don't paraphrase it.

MR. STREET [plaintiff's counsel]: I don't specifically know if [W.K.] went to the guidance counselor. If I had to guess I would say yes.

MR. MILLS: Then read the rest of it.

MR. STREET: But I can't remember that specifically.

Based upon all of the testimony, we conclude that the evidence does not preponderate against the trial court's finding that Ms. Thompson "believed she had sent W.K. to guidance for bullying," especially since this determination hinged in part on the trial court's evaluation of the witness's credibility. The trial court specifically noted the contrary testimony of other school officials that W.K. "was never specifically identified as a student bullying or mistreating Jacob."

The County also emphasizes that W.K.'s name does not appear in any of the school records related to Jacob. However, school officials admitted at trial that school records did not document everything that occurred at support team meetings or in communications between school employees and parents. Principal Baggett and Ms. Thompson testified that they did not keep records or notes from their meetings with Jacob or his mother. Moreover, the fact that Jacob did not list W.K. on his preferred seating list for Ms. Knipfer's class is not inconsistent with his allegations of being teased and bullied by W.K. because, for that class, Jacob only listed students he wanted to sit near, not those he did not want to sit near.

Furthermore, we do not accept the County's premise that foreseeability must be based on a history of previous incidents involving the same students. The County cites the case of *Mason v. Metropolitan Government of Nashville & Davidson County*, 189 S.W.3d 217 (Tenn. Ct. App. 2005). In that case, the plaintiff was injured when another student cut her with a razor provided as part of the cosmetology curriculum. *Id.* at 218-19. The court stated the issue to be as follows:

[W]hether it was foreseeable that a student like Ms. Moore [the attacker]–who had received proper instruction as to the safe use and transportation of the cosmetology kit, who had been tested on those instructions, who had been warned that an improper use of the kit or its contents could violate the zero tolerance policy, and who had no history of violence–would take the razor from the cosmetology kit and use it as a weapon to criminally assault another student at school.

*Id.* at 226. The court concluded that it was not foreseeable that the cosmetology student would use the razor to assault the plaintiff and, therefore, the teacher's negligence in allowing students to transport their cosmetology kits was not the proximate cause of the plaintiff's injuries. *Id.* at 227.

In the present case, unlike in *Mason*, the school was aware of prior incidents of bullying or teasing involving Jacob, and there was some evidence that W.K. was one of the bullying students identified to the school. Moreover, the present case differs significantly from *Mason* because Jacob had special needs that were known to the school.[2] As the trial court found, "the school system was aware that Jacob had Asperger's and the characteristics or indications that Jacob would exhibit as a result." The school knew that Jacob had difficulty reading social cues and getting along with peers and that he had "meltdowns." Even if the school was not aware of any previous physical altercations involving Jacob or W.K., as emphasized by the County, Jacob's social limitations and tendency to react inappropriately made a physical confrontation foreseeable.

The trial court's conclusions of law include the following:

> Given what the Defendant knew about Jacob, his limitations, his perceptions, his complaints and those of his mother, and the actions they had taken against other students after investigating Jacob's complaint, it was certainly foreseeable that other incidents in which Jacob would be abused or perceive himself to be abused would occur. It was also foreseeable that Jacob would react in an inappropriate manner.

In light of Jacob's special circumstances and the school's knowledge of his problems and history, we cannot say that the evidence preponderates against the trial court's finding of foreseeability.

2.

The County also argues that its actions were not negligent–i.e., that the school did not breach the duty of care owed to Jacob. The trial court found the County negligent as follows:

> Ms. Knipfer was negligent in failing to follow the school board's policy and the instructions of the principal and assistant principal with regard to leaving students in the classroom unattended. . . . The principal and other school officials were negligent in failing to properly advise Ms. Knipfer of Jacob's condition and in failing to properly follow through with regards to the accommodations they had agreed to make for Jacob.

The evidence does not preponderate against the trial court's determination that the County

_____

[2]We find the case of *Chudasama v. Metropolitan Government of Nashville & Davidson County*, 914 S.W.2d 922 (Tenn. Ct. App. 1995), to be distinguishable for these same reasons.

breached its duty of care.

With respect to the teacher leaving the class unattended, the County argues that leaving a class of seventh graders unsupervised for five minutes is not negligent. Under the circumstances of this case, however, we must disagree. Principal Baggett testified that it was school policy not to leave children unsupervised and that, if a teacher had to leave the classroom, he or she was to ask another teacher to "keep an eye" on the class. Principal Baggett further testified that, in light of Jacob's condition and his complaints about bullying, he should not have been left in the room without a teacher present.[3] In light of what the school system knew about Jacob and his complaints of bullying, the evidence does not preponderate against the trial court's conclusion that Ms. Knipfer was negligent when she left him unsupervised in a classroom with a group of middle school students lined up for dismissal.

As to the second ground for negligence (failure to disseminate information), the County argues that the IEP process "was not designed to serve the purpose of addressing issues like autism, Asperger's, or social problems." The salient point, however, is that the school system failed to disseminate, through the IEP process or otherwise, important information about Jacob's Asperger's and his problems with bullying. Ms. Knipfer started in the middle of the year. She testified that, through informal conversations with other teachers, she learned that Jacob had been diagnosed with Asperger's and that he was allowed to have preferential seating. According to Ms. Knipfer's testimony, she was not given individualized information about the nature of Jacob's Asperger's diagnosis, how the condition affected him, or what might trigger symptoms. She was not aware of the information in the psychologist's letter, sent in April 2006, that children with Asperger's were often teased and bullied. She was not aware of any other accommodations (other than preferential seating) applicable to Jacob. Furthermore, Ms. Knipfer was not advised that Jacob and his mother had complained of bullying by W.K. Ms. Knipfer testified that, had she known about Jacob's limitations, she would have been much more likely to make sure someone was watching her classroom.[4]

The evidence does not preponderate against the trial court's finding that the school system was negligent in failing to properly advise Ms. Knipfer about Jacob's condition. *See*

_____

[3]On the issue of causation, Jacob and W.K. both testified that the altercation would not have happened if a teacher had been present.

[4]Because the evidence supports these grounds of negligence, we need not consider the trial court's additional ground concerning the school system's failure to follow through on agreed accommodations for Jacob.

*generally Small v. Shelby Cnty. Sch.*, No. W2007-00045-COA-R3-CV, 2008 WL 360925 (Tenn. Ct. App. Feb. 12, 2008) (asthmatic student injured in physical education class; jury found school system liable for failing to disseminate information about student's medical problems to teachers).

Finally, we note that the County disagrees with the plaintiff's use of the term "bullying," asserting that the incidents reported by Jacob and his mother reflect the kind of teasing and "goofing" engaged in by typical middle school kids. We need not, however, determine whether any of these incidents constitute bullying. Rather, this case involves a failure of supervision and of dissemination of information. Given what it knew about Jacob's developmental limitations, including his inability to react appropriately to social cues and his tendency to have meltdowns, the school board should have foreseen that he could be injured by another student when left unsupervised.

CONCLUSION

The decision of the trial court is affirmed. Costs of appeal are assessed against the County, and execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE