960 So.2d 568 (2007)
Regan PRITCHARD, Appellant
v.
Harold VON HOUTEN and The University of Southern Mississippi, Appellees.
No. 2005-CA-00710-COA.
Court of Appeals of Mississippi.
February 6, 2007.
Rehearing Denied May 15, 2007.
*571 Leonard Brown Melvin, Hattiesburg, attorney for appellant.
Stephen P. Kruger, Michael Jeffrey Wolf, Jackson, attorneys for appellees.
Before KING, C.J., CHANDLER and ROBERTS, JJ.
CHANDLER, J., for the Court.
¶ 1. On November 17, 2000, Regan Pritchard received a third degree burn injury to her ankle at an iron pour demonstration conducted by a tenured University of Southern Mississippi professor at the University of Kentucky. Pritchard sued the professor, Harold "Skip" Von Houten, the University of Southern Mississippi (USM), and several unknown defendants, alleging that Von Houten's negligent acts *572 and omissions at the iron pour had caused her injury. USM answered and asserted that it was immune from suit pursuant to Mississippi Code Annotated section 11-46-9(1)(d) (Rev.2002), which provides for immunity from claims based upon a state employee's exercise of a discretionary function. Later, Von Houten was dismissed from the suit because Pritchard had alleged that Von Houten was acting within the course and scope of his employment with USM when he committed the negligent acts and omissions, and he was, therefore, immune from suit in his individual capacity pursuant to Mississippi Code Annotated section 11-46-7(2) (Rev.2002).
¶ 2. After a bench trial, the trial court found that Von Houten and USM were not negligent and that USM was immune from suit for the injury because Pritchard's claim was based on Von Houten's exercise of a discretionary function. Pritchard appeals, arguing that the trial court erroneously found that USM was not negligent and that USM was entitled to discretionary function immunity.
¶ 3. We find that all of the credible record evidence substantially showed that USM was negligent and that the trial court's decision was manifestly wrong. We further find that USM was not entitled to discretionary function immunity under section 11-46-9(1)(d). Therefore, we reverse and remand this case for a new trial limited to the issue of damages.

FACTS
¶ 4. Professor Von Houten taught sculpture at USM. In the fall 2000 semester, Regan Pritchard was a student at USM working toward a Bachelor of Arts degree with an emphasis in three dimensional design. At that time, Pritchard had taken several classes from Professor Von Houten, and was enrolled in Von Houten's iron casting class. Pritchard's ambition was to become a sculpture and ceramics teacher.
¶ 5. Von Houten testified that he had done artistic iron casting since 1986 and had established USM as a leader in the field. He was self-taught, and conducted three to four iron pours per year. Von Houten and others testified about the process of iron pouring to create artistic sculpture. A special furnace, called a "cupola," is used to heat scrap iron, coke, and flux. When the iron reaches between 2500 and 2700 degrees Fahrenheit, it flows out of a hole in the bottom of the cupola. This process is called "tapping" the cupola. A ladle is used to collect the molten iron. Slag, a byproduct, is skimmed from the surface of the molten iron in the ladle. Then, the molten iron is poured from the ladle into prepared sculpture molds, where it cools and solidifies. During an iron pour, the hole in the cupola can be plugged and the iron flow stopped with a device called a "bott." A ladle used to collect the molten iron must be heated, or "burned in" before use. Von Houten testified that neither he nor the art department promulgated any safety information, manuals or checklists applicable to iron pours.
¶ 6. In November 2000, Von Houten was invited by the University of Kentucky (UK) to give a lecture and demonstrate an iron pour at UK, which is located in Lexington, Kentucky. UK paid Von Houten $550 for the lecture, plus room and board. Von Houten asked Pritchard to participate in the iron pour at UK. Other USM students attended the iron pour as well. USM paid for the students' trip expenses. Von Houten testified that the UK iron pour benefitted USM by enhancing its reputation in the field of iron pouring. Von Houten and Pritchard testified that the USM students benefitted from participating in the UK iron pour because it was an opportunity to make connections with other *573 art faculty and students. Pritchard testified that her participation in the pour had a bearing on her grade for the course. Pritchard had attended approximately ten previous iron pours conducted by Von Houten at USM, and had been involved in iron casting for approximately two years.
¶ 7. Von Houten testified that he was totally in charge of the trip to UK and the UK iron pour. Von Houten testified that they drove to Lexington on November 14, 2000. Von Houten brought his own car. An adjunct professor, Dan Askew, drove USM students in a van which he checked out from the USM motor pool. Von Houten and Askew were the only USM employees who went on the trip. As found by the trial court, Askew permitted marijuana to be smoked in the van on the drive to Lexington.
¶ 8. The UK iron pour was a group effort with students performing various duties and Von Houten in charge. Two people, including Von Houten's sixteen-year-old son, acted as the "pour masters" who set things up for the pour. However, Von Houten testified that he was in charge of how the pour was set up and conducted. Von Houten testified that the students were responsible for their own safety at the iron pour, and had the option of purchasing their own safety equipment from Master Safety in Birmingham, Alabama or using safety equipment provided by USM. Some of the safety equipment used by persons working around the cupola included leather leggings worn over safety boots, aprons, and face shields. Von Houten stated that he never inspected the students to make sure their equipment was worn properly, but that his practice was to look around at the students' gear and to point out any safety problems that he noticed.
¶ 9. Pritchard testified that she spent the first two days of the UK trip working on her sculpture molds and assisting the UK students with their molds. On November 17, 2000, she attended Von Houten's lecture and then went to the UK foundry which was to be the site of the iron pour demonstration. The UK foundry had an outdoor area where the iron pour was to be conducted. At the foundry, Pritchard was working on the molds when someone told her the molten iron was ready. Pritchard put on her safety equipment with the assistance of Cara Johnston, another USM student. Pritchard wore a face shield, welding overalls, cotton socks, boots that came up over her ankles, and leather leggings worn over her boots. The leggings covered the front of her legs and tied in the back of her legs. The leggings were further secured at the top and bottom with four inch strips of duct tape wrapped several times around her leg and boot. Pritchard and Johnston testified that Pritchard's safety equipment was on correctly. Von Houten testified that he did not notice any problems with the safety equipment that Pritchard was wearing at the pour.
¶ 10. All the evidence indicated that the temperature at the UK iron pour was about freezing with light snow falling, which melted when it touched the ground, and that the ground was wet. Pritchard testified that Von Houten had assigned her to the position of scraping slag off the ladle of molten iron, and that she went to that position after putting on her safety equipment. Pritchard testified that, at that time, the other students were not ready and were still getting dressed. In fact, the evidence was in agreement that only one of the pour masters was in attendance and that only one ladle had been heated. At this time, one of students participating in the pour had been sent out by Von Houten to buy a case of beer.
*574 ¶ 11. Pritchard testified about how she was injured. When the cupola was tapped, molten iron flowed into the ladle. Two students, Jason Cones and James Davis, held each end of the ladle. The molten iron was coming out too fast and overflowed the ladle onto the ground, where it began popping up into the air in an explosive fashion. Von Houten told Pritchard to grab a second ladle. She and another student picked up a second ladle and approached the cupola. As they approached the cupola, Cones and Davis were carrying the first ladle, filled with molten iron, away from the cupola. Cones and Davis were four or five feet away from Pritchard. At that point, Pritchard felt something burning her ankle in the area of her Achilles tendon. She set her end of the ladle down and began screaming that she had iron in her boot. She was unable to immediately remove her boot due to the duct tape, but located a bucket of water and put her foot in it. Finally, Pritchard was able to remove her boot and Von Houten looked at the injury. He told Pritchard to put Silvadene burn cream on it and advised her not to go to the hospital. Pritchard testified that she thought the iron that burned her had spilled out of the first ladle and popped into her boot. Pritchard stated that a UK student was also burned. Several students witnessed the molten metal popping up from the ground at the first tap, one student describing it as an "explosive" and "uncontrolled" situation.
¶ 12. After her injury, Pritchard remained at the foundry for the duration of the iron pour. She testified that, based on Von Houten's advice, she did not go to the hospital until the morning of November 19, when she returned from the trip. Pritchard sustained a third degree burn, for which she had a debridement surgery to remove iron and dead tissue from the wound, and had a subsequent surgery to apply a skin graft. Pritchard required bed rest and had to drop out of school, forfeiting $4,000 in tuition and a semester of work. As a result of the injury, Pritchard has limited range of motion and strength in her left ankle and hypersensitivity on her skin graft. She has medical bills in excess of $13,000, is limited to working at the light work level, and can no longer participate in iron casting.
¶ 13. Von Houten also testified about how the injury occurred. Von Houten admitted that on the day of the iron pour he had consumed one beer with lunch, another before the pour began, and another during the pour after Pritchard was burned. He testified that the cupola they used at the UK iron pour had been transported from USM. Von Houten testified that the cupola was lit at 3:30 p.m. At 5:00 p.m., cold air was blown into the cupola to increase burning. About fifteen to twenty minutes later, the molten iron was ready. Von Houten stated that he was working the bott and the tap pole, which is used to manipulate the bott. When Von Houten tapped the cupola, the molten iron poured into the first ladle. Von Houten testified that he had difficulty replacing the bott, the ladle overflowed, and approximately seventy pounds of molten iron struck the wet ground and began popping off the ground. He called for a second ladle. Then, Pritchard was burned. After that incident, the pour continued for about two hours. At the trial, Von Houten was unable to say exactly how Pritchard had been burned.
¶ 14. There was substantial evidence tending to show that, when molten iron falls on wet ground, the iron can pop up from the ground explosively. Shortly after the iron pour, Von Houten drafted notes about the pour that were admitted into evidence. The notes stated, in pertinent part: "Metal was good and hot. No short pours. 1st tap bad because we didn't *575 have two ladles ready. One ladle full went on wet ground. Metal flying everywhere. Two people burned. Poured at least 50 molds." On November 30, 2000, Von Houten drafted a written memorandum reporting the accident to Jennifer Torres, the Chair of the Art Department. The memorandum stated that Pritchard's burn was the cast iron program's first hospitalized burn in the program's twelve year history. The memorandum also described how the accident occurred:
The first tap was troublesome in that there was too much metal coming out of the furnace. The ladle filled completely and an unsuccessful attempt was made by me to stop the stream. This is not unusual for metal to run out onto the ground but it is undesirable. About 70 lbs. of molten metal hit the wet ground. When molten metal hits wet soil the reaction caused by steam pressure makes the metal dissipate and fly into the air in sparks and steam. It seems as i[f] some of this flying metal entered her boot somehow working into part of the leggings she was wearing. The burn looked to be a little larger than a quarter in size. Silverdine burn ointment was applied to the burn. The student declined further medical treatment and remained for the rest of the iron pour.
Moreover, Von Houten testified that when hot metal hits wet ground, "it is not good." He stated that hot metal will bounce up more with wet ground and that it is better not to have wet ground during an iron pour.
¶ 15. There was also evidence pertaining to the practice of putting down dry sand before an iron pour. Von Houten testified that it is common for metal to splash on the ground during an iron pour. Von Houten admitted that, had dry sand been put down, there would have been less of a chance for metal to pop up off the ground when spilled, and that dry ground would have been better. Von Houten stated that he was responsible for preparing the site for the pour and conducting the pour. Von Houten stated that he observed that the floor of the UK foundry was a sandy soil mixture and that he did not put down any dry sand.
¶ 16. Pritchard's iron casting expert, Peter H. Meyst, testified that the metal popping and flying everywhere at the UK iron pour was a direct result of sand not being put down on a wet surface. He testified that, in industrial settings, the American National Standards Institute safety requirements call for a layer of dry sand to be placed under and around furnaces where molten metal is being handled. Meyst also testified that, in industrial settings, molten iron is heated to the same temperature as it is in art casting. Meyst testified that molten iron spills are common at iron pours and that people can be burned even if their safety equipment is worn properly. In Meyst's opinion, to a reasonable degree of probability, the failure to put down dry sand caused or contributed to Pritchard's burn injury. On cross-examination, Meyst acknowledged his deposition testimony in which he stated that he could not say to a reasonable degree of probability whether the failure to put down sand caused or contributed to the injury. However, on redirect examination, Meyst indicated that his opinion had changed since reading witness depositions and hearing all of the trial testimony.
¶ 17. Professor Barry Bailey, a friend of Von Houten's and the head of the sculpture area at Tulane University, testified as an expert witness for USM. Bailey stated that he had attended over one hundred iron pours and had thirty years of art casting experience. He stated that he did not always adhere to the American National *576 Standards Institute safety requirements because those were drafted for industrial settings. Bailey stated that, in preparing for an iron pour when the ground was wet, he sometimes put down dry sand. He opined that, when molten iron hits a cold surface, it congeals and does not pop up and fly around. Bailey agreed, however, with Von Houten's written statement that, when molten metal hits wet soil, the steam reaction makes the metal dissipate and fly into various parts of the steam. Bailey stated that the molten iron would "dissipate[] into little b-b size pieces." Bailey stated that he had poured iron in "a driving rain storm" with puddles on the ground and that he had learned from that exercise that spilled molten iron "just dissipates" in those conditions. Bailey stated that he did not know if the condition of the ground at the UK pour caused or contributed to Pritchard's injury. He stated that, to a reasonable degree of probability, USM was not negligent.
¶ 18. The trial court adopted many of Pritchard's proposed findings of fact, some of USM's proposed findings of fact, and USM's proposed conclusions of law. The court found that Von Houten was the supervisor of the iron pour and was responsible for the conduction of the iron pour. The court found that the metal that burned Pritchard did not come from the cupola. The court found that the ground in the area of the iron pour was wet, but that "in rainy conditions, metal would more tend to solidify and contain itself quicker, being less dangerous." Yet, the court found that "the first tap of the iron pour was `bad' as two ladles were not ready, one ladle fell on the wet ground, metal was flying everywhere, and the Plaintiff was burned." The court found that, while dry sand had not been put down prior to the iron pour, Von Houten had testified that he had elected not to put down dry sand because the foundry floor was composed of sandy soil. The court found that Pritchard did not cause or contribute to her injury by any act or omission of her own.
¶ 19. The court concluded that USM was not negligent. The court found that, pursuant to Garrett v. Northwest Mississippi Junior College, 674 So.2d 1 (Miss. 1996), USM owed no duty of care to Pritchard given her age and her experience with iron pouring. The court opined that Pritchard had not shown that USM had breached any duty to her. Regarding causation, the court found that there was no showing that there was any defect in Pritchard's safety equipment, and that Pritchard's expert could not testify to a reasonable degree of probability that the wet ground caused the burn. The court concluded that the dangerous nature of the iron pour was obvious and would have been obvious to Pritchard given her experience. Finally, the court found that USM was immune from liability because the iron pour involved completely discretionary decisions by USM's employees made in the course and scope of their employment.

STANDARD OF REVIEW
¶ 20. A circuit court judge sitting without a jury is afforded the same deference as a chancellor. City of Jackson v. Perry, 764 So.2d 373, 376 (¶ 9) (Miss.2000). On review of the outcome of a bench trial, after reviewing the entire record, we will affirm if the judge's findings of fact are supported by substantial, credible, and reasonable evidence. Id. We review all questions of law de novo, including the proper application of the Mississippi Tort Claims Act. Maldonado v. Kelly, 768 So.2d 906, 908 (¶ 4) (Miss.2000). Thus, we will not disturb the trial court's findings unless they were manifestly wrong, clearly erroneous, or an erroneous legal standard was *577 applied. City of Jackson, 764 So.2d at 376 (¶ 9).
¶ 21. In this case, the trial court substantially adopted the proposed findings of fact of both parties and the conclusions of law submitted by USM. In this scenario, our deference to the trial court's fact-findings is lessened. Omnibank of Mantee v. United So. Bank, 607 So.2d 76, 83 (Miss.1992) (citing Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1266 (Miss. 1987)). We must "view the challenged findings of fact and the appellate record as a whole with a more critical eye to ensure that the trial court has adequately performed its judicial function." Rice Researchers, 512 So.2d at 1265.

LAW AND ANALYSIS
I. THE TRIAL COURT ERRED IN FINDING THAT THE UNIVERSITY OF SOUTHERN MISSISSIPPI WAS NOT NEGLIGENT.
¶ 22. USM is responsible for the negligence of its employees acting within the course and scope of their employment. Miss.Code Ann. § 11-46-5(1) (Rev.2002). A plaintiff asserting a claim of negligence must prove by the preponderance of the evidence the elements of duty, breach, proximate causation, and damages. May v. V.F.W. Post No. 2539, 577 So.2d 372, 375 (Miss.1991). As discussed below, we find that all of the credible evidence substantially showed that Pritchard had proved by a preponderance of the evidence that Von Houten owed Pritchard a duty of ordinary care in conducting the iron pour, that Von Houten breached that duty by failing to put down dry sand in the areas where molten iron was handled, and that this failure was the proximate cause of Pritchard's burn injury.
¶ 23. The trial court held that, due to Pritchard's age and experience, USM owed Pritchard no duty of care in its conduct of the UK iron pour. In so holding, the trial court relied upon Garrett v. Northwest Mississippi Junior College, 674 So.2d 1 (Miss.1996). In Garrett, a junior college student sued Northwest Mississippi Junior College after he accidentally cut off his thumb while using a milling machine in his tool and die class. Id. at 1. The trial court granted summary judgment for the junior college. Id. The supreme court reversed, finding that genuine issues of material fact existed concerning the extent of the safety and use instruction which Garrett received about the machine and the adequacy of the instructor supervision. Id. at 2. The court reviewed case law from other jurisdictions and held that the extent of the duty owed by vocational education teachers and schools to their students "is framed largely in terms of the degree of safety and use instruction that students receive on the particular machine that is being used when an accident occurs, as well as the extent of teacher supervision at the time of the accident." Id.
¶ 24. The Garrett court considered Miles v. School District No. 138 of Cheyenne County, 204 Neb. 105, 281 N.W.2d 396 (1979), in which the court concluded that the student's own negligence was the sole proximate cause of injuries she received while operating a jointer machine in shop class. In that case, the court examined the extent of training she had received on the machine, the safety instruction she received, her performance on safety examinations, and the frequency of her use of the jointer machine. Id. at 2-3. The court in Miles found that, due to the plaintiff's education and experience pertaining to the jointer machine, she was thoroughly familiar with operating the machine and the hazards of using the machine. Id. The Garrett court also reviewed Paulsen v. Unified School District No. *578 368, 239 Kan. 180, 717 P.2d 1051 (1986). Id. at 3. In Paulsen, a student was injured when using a table saw without the safety guard. Id. The court stated that the teacher had a duty to properly supervise the student and the school district had a duty to properly supervise the teacher and to provide a reasonably safe environment for the students. Id. The court found that the duty had not been breached because the student had received extensive instruction on using the table saw, having been instructed multiple times on safe tool use and having passed a test on safe use of the saw. Id. The Garrett court also relied upon Roberts v. Robertson County Board of Education, 692 S.W.2d 863 (Tenn.Ct. App.1985), where a student was injured while using a power driven drill press. Id. at 3-4. The Tennessee court imposed a duty of care upon a high school vocational teacher "to take those precautions that any ordinary reasonable and prudent person would take to protect his shop students from the unreasonable risk of injury." Id. (quoting Roberts, 692 S.W.2d at 870). The Roberts court further stated:
The extent of these precautions must be determined with reference to the age and inexperience of the students involved, their less than mature judgment with regard to their conduct, and the inherently dangerous nature of the power driven equipment available for their use in the shop. In order to discharge this duty, it is incumbent upon a teacher, at a minimum, to instruct his students in the safe and proper use of the equipment, to warn the students of known dangers, and to supervise the students to the extent necessary for the enforcement of adequate rules of shop safety.
Once the trial court has determined that the defendant was under a duty to protect the plaintiff against the event that did, in fact, occur, then it must be proven that the defendant's actions or failure to act constituted a breach of this duty. This second element of proof in a negligence case usually requires a factual determination that can only be made upon the unique facts of each case.
Id. After reviewing these cases, the Garrett court concluded that "[m]atters of safety and use instruction on specific machinery and the extent of instructor supervision have been outcome determinative in the shop class injury cases from other jurisdictions." Id. The court reversed and remanded the case for a trial because there were disputed fact questions regarding the instruction and supervision Garrett had received. Id.
¶ 25. In this case, the trial court held, pursuant to Garrett, that any duty owed by USM to Pritchard in conducting the iron pour "must be determined with reference to the age and experience of the plaintiff." The court found that, given Pritchard's adulthood and years of experience with iron pouring, no duty of care was owed. Garrett held that, in college vocational classes, the more instruction, experience, and maturity a student possesses, the less instructor supervision is necessary to comply with the duty of care. Thus, if a student is mature and has had voluminous experience with and instruction on using a dangerous machine, the instructor exercises reasonable care by rendering less supervision than would be required for a student who is using the same machine but has less education, experience, and maturity.
¶ 26. This analysis is inapposite to Pritchard's claim that Von Houten negligently prepared the iron pour site. Pritchard's claim based on the failure to put down dry sand was not dependent upon inadequate supervision by Von Houten. Rather, it was dependent on Von Houten's acts and omissions in his preparation *579 of the site of the iron pour. Von Houten testified that it was his sole responsibility to make sure the iron pour was properly set up and pursuant to that responsibility he omitted to put down dry sand. Thus, the negligent act or omission complained of by Pritchard concerning the sand was not based upon Von Houten's negligent supervision of Pritchard, but upon his negligent preparation of the site. Concerning the site preparation, Pritchard's age, experience, and maturity were irrelevant to the question of duty because those qualities would not have protected her or any other participating student from a site preparation error by the instructor responsible for site preparation decisions.
¶ 27. Having determined that the trial court misapplied Garrett in determining the question of duty, we turn to that question ourselves. The existence of a duty is a question of law. Rein v. Benchmark Const. Co., 865 So.2d 1134, 1143 (¶ 29) (Miss.2004). An important component of the existence of a duty is that the injury is reasonably foreseeable. Id. While Garrett involved an injury allegedly caused by the negligent supervision of a student's use of a dangerous machine and this case involves an injury allegedly caused by the negligent preparation of the site of a dangerous vocational activity, Garrett is instructive concerning the applicable duty of care in this case. In arriving at its holding, the Garrett court extensively quoted from Roberts, including the holding that a vocational teacher "has the duty to take those precautions that any ordinary reasonable and prudent person would take to protect his shop students from the unreasonable risk of injury." Garrett, 674 So.2d at 3 (quoting Roberts, 692 S.W.2d at 870). In Garrett and Roberts, that duty included providing that level of supervision of shop students deemed necessary in light of the student's age, experience, and maturity. It is reasonably foreseeable that an injury to shop students engaged in dangerous activities could occur not only from inadequate supervision, but also from an improperly prepared activity site. Therefore, we find that a vocational instructor's duty to take those precautions that any ordinary and reasonable person would take to protect shop students from the unreasonable risk of injury extends to preparation for the activity and preparation of the site for the activity.
¶ 28. Our decision is supported by the fact that other jurisdictions have recognized as a general rule that a college teacher owes a duty of reasonable care to students. See Allen E. Korpela, Annotation, Tort Liability of Public Schools and Institutions of Higher Learning for Accidents Associated with Chemistry Experiments, Shopwork, and Manual or Vocational Training, 35 A.L.R.3d 758 (1971). In Doe v. Yale University, 252 Conn. 641, 748 A.2d 834, 847 (2000), the court, citing Garrett and other cases, recognized that "[t]he duty of an educator or supervisor to use reasonable care so as not to cause physical injury to a trainee during the course of instruction or supervision is not novel." In Arizona, a college owes its student a duty of reasonable care not to expose the student to an unreasonable risk of harm. Delbridge v. Maricopa Cty. Community Coll. Dist., 182 Ariz. 55, 893 P.2d 55, 59 (Ct.App.1994) (duty of reasonable care was owed by a college to a student rendered a paraplegic in a fall from a pole during a lineman training course). In New York, a teacher has a duty to exercise reasonable care to prevent injury to students, including an obligation not to direct a student to do that which is unreasonably dangerous, to see that any equipment supplied is reasonably safe for its intended use, and to provide such instruction *580 or supervision that is reasonably necessary to safely perform the intended tasks or to use the equipment supplied. Yarborough v. City Univ. of New York, 137 Misc.2d 282, 520 N.Y.S.2d 518, 520-21 (N.Y.Ct.Cl.1987).
¶ 29. As a college instructor responsible for conducting an iron pour with student participants, Von Houten had a duty to take those precautions in preparing for the iron pour which any ordinary and reasonable person would take to protect the participating students from the unreasonable risk of injury. A defendant charged with a duty to exercise ordinary care "must only take reasonable measures to remove or protect against `foreseeable hazards' that he knows about or should know about in the exercise of due care." Donald v. Amoco Prod. Co., 735 So.2d 161, 175 (¶ 48) (Miss.1999). Such a defendant must safeguard against reasonable probabilities, "and is not charged with foreseeing all occurrences, even though such occurrences are within the range of possibility." Id. A defendant whose conduct is reasonable in light of the foreseeable risks will not be found liable for negligence. Id.
¶ 30. There was substantial evidence in the form of testimony from Von Houten, Meyst, and Bailey that molten iron spillage is a common occurrence during iron pours. The testimony was undisputed that burn injuries can occur during iron pours despite the use of proper safety equipment. All of the evidence indicated that the ground was wet at the UK pour. Meyst testified and Von Houten testified and indicated in his notes that molten iron pops and flies into the air when it contacts wet ground. The testimony of Bailey, USM's expert, did not substantially contradict this evidence. This evidence indicates that it should have been reasonably foreseeable to Von Houten that molten iron would spill during the iron pour and that, given the wet ground at the UK foundry, the spilled iron would have had a dangerously explosive effect. Further, there was substantial evidence that at iron pours the risk of injury from molten iron spills is minimized by the practice of placing dry sand on the ground in the areas where molten iron is to be handled. The substantial, credible evidence introduced at the trial showed that, as a reasonable precaution against burn injuries, Von Houten should have placed dry sand on the wet ground at the foundry to protect participants from burns caused by foreseeable molten iron spillage. Von Houten's failure to do this breached his duty to take reasonable precautions to protect his students from injury.
¶ 31. Moreover, the evidence substantially showed that the failure to place sand in the areas where molten iron was handled proximately caused Pritchard's burn injury. "Proximate cause of an injury is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred." Gulledge v. Shaw, 880 So.2d 288, 293 (¶ 11) (Miss.2004). All of the credible evidence, including Pritchard's testimony, Von Houten's notes following the accident, and the testimony of the other student witnesses indicated that Pritchard's burn injury occurred when molten iron popped up off the wet ground during the first tap of the cupola. There was no dispute that Pritchard was injured when spilled molten iron became airborne after contacting the ground. Meyst testified to a reasonable degree of probability that, whether the specific piece of iron that burned Pritchard spilled from the cupola or from the ladle, it was the wet condition of the ground that caused it to pop up and into Pritchard's boot. Von Houten's notes *581 also indicate that Pritchard was burned when the molten iron popped up "in a reaction caused by steam pressure" after striking the wet ground. There was simply no other explanation for how Pritchard was injured.
¶ 32. We find that, because the evidence substantially established negligence on the part of Von Houten and USM, the trial court's ruling constituted manifest error and was clearly erroneous.
II. THE TRIAL COURT ERRED BY FINDING THAT THE HEATING, POURING, AND ART CASTING OF IRON IS A DISCRETIONARY FUNCTION ENTITLING THE APPELLEES TO IMMUNITY UNDER THE MTCA.
¶ 33. In the lower court, USM argued it was entitled to discretionary function immunity under the Mississippi Tort Claims Act (MTCA). USM is a state university that falls within the coverage of the MTCA. Miss.Code Ann. § 11-46-1(j) (Rev. 2002); Miss.Code Ann. § 37-119-1 (Rev. 2001). Section 11-46-9(1)(d) of the MTCA provides immunity for a governmental entity and its employees acting within the course and scope of employment for any claim "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused." Miss.Code Ann. § 11-46-9(1)(d) (Rev.2002).
¶ 34. In Jones v. Mississippi Department of Transportation, 744 So.2d 256, 260(¶ 10) (Miss.1999), our supreme court adopted a two-part public policy function test for determining whether governmental conduct is protected by discretionary function immunity. Id. The test provides that, in determining whether governmental conduct is afforded discretionary function immunity, the court first must determine whether the activity involved an element of choice or judgment, and, if so, whether the choice involved social, economic, or political policy. Id. Under the discretionary function exemption, "only those functions which by nature are policy decisions, whether made at the operational or planning level, are protected." Id. (citing U.S. v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). "The purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. The court observed that section 11-46-9(1)(d) appears to be patterned after the discretionary function exemption to the Federal Tort Claims Act. 28 U.S.C. § 2680(a).
¶ 35. In the instant case, the trial court found that a duty is discretionary when the government employee must use his own judgment or discretion in performing that duty, and that USM was entitled to immunity because the iron pour involved decisions by USM employees that were completely discretionary. Pritchard argues that, in holding that discretionary function immunity applied, the trial court erroneously neglected to apply the second part of the two-part public policy function test articulated in Jones, pursuant to which immunity lies only where the government actor's choice or judgment involved social, economic, or political policy. USM contends that the Jones analysis has not been consistently applied since its adoption, and urges this Court to resolve the discretionary function issue without regard to whether the choice or judgment involved social, economic, or political policy. Mississippi's most recent precedent on this issue has recognized the two-part test; therefore, this Court has no doubt that it is to adhere to the two-part public policy *582 function test in determining the application of discretionary function immunity. Miss. Dept. of Mental Health v. Hall, 936 So.2d 917, 925 (¶ 19) (Miss.2006); Dotts v. Pat Harrison Waterway Dist., 933 So.2d 322, 326 (¶ 9) (Miss.Ct.App.2006).
A. Whether the activity involved an element of choice or judgment
¶ 36. Applying the public policy function test, we proceed to determine whether the government activity at issue in this case was subject to discretionary function immunity. Under the first part of the test, we must determine whether the government activity involved an element of choice or judgment. An act is not discretionary, but is ministerial, if "the duty is one which has been positively imposed by law and its performance required at a time and in a manner or under conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion." Stewart ex rel. Womack v. City of Jackson, 804 So.2d 1041, 1048 (¶ 15) (Miss.2002) (quoting L.W. v. McComb Separate Mun. Sch. Dist., 754 So.2d 1136, 1141 (Miss.1999)). Pritchard and USM have no disagreement that Von Houten's conduct of the iron pour was not pursuant to any statute, regulation, or policy, and, therefore, it was not ministerial and involved an element of choice or judgment.
B. Whether the choice or judgment involves social, economic, or political policy
¶ 37. The act involving choice or judgment at issue is Von Houten's failure to put down dry sand before conducting the iron pour. While we have found that failure to have been negligent, the failure to exercise ordinary care does not remove a governmental act from the protection of discretionary function immunity. Collins v. Tallahatchie County, 876 So.2d 284, 289 (¶ 17) (Miss.2004). Thus, we examine whether Von Houten's choice or judgment involved social, economic, or political policy.
¶ 38. Not all discretionary duties are protected by immunity. Jones, 744 So.2d at 260. While the majority of day-to-day acts in governmental operations involve the exercise of some form of discretion, it is only those decisions which are based on considerations of public policy that are protected. Dotts, 933 So.2d at 327 (¶ 15) (citing Elder v. U.S., 312 F.3d 1172, 1176 (10th Cir.2002)). The proper inquiry is whether the decision "`implicates the exercise of a policy judgment of a social, economic, or political nature.'" Id. Our focus is on the nature of the acts taken and their susceptibility to policy analysis; we do not examine the actual subjective thought processes of the government decisionmaker. Id. at 328 (¶ 16). For example, in Dotts, the decisions of the Pat Harrison Waterway District concerning the enclosure of a swimming area, the placement of signage, and the provision of safety equipment and lifeguards were grounded in public policy because the costs and practicality of those decisions could be weighed against their value to the public. Id. at 327-28(¶ 16).
¶ 39. However, "[i]n certain circumstances, it may be obvious that a decision implicates none of the public policies that ordinarily inform an agency's decisionmaking." Elder, 312 F.3d at 1182. Thus, the activity of driving an automobile in the course and scope of an official's employment, though requiring the official's use of discretion, is not protected by discretionary function immunity because the official's discretionary decisions could not be based upon any regulatory purposes the government authority seeks to accomplish. *583 Gaubert, 499 U.S. at 325 n. 7, 111 S.Ct. 1267. USM argues that Von Houten's conduct at the iron pour furthered a public policy favoring a well-rounded education. However, in Duke v. Department of Agriculture, 131 F.3d 1407, 1411 (10th Cir. 1997), the Tenth Circuit rejected the idea that a choice involving any hint of policy concerns would be within discretionary function immunity because that approach would "eviscerate" the social, economic, or political policy prong of the test and would allow the discretionary function immunity exception to "swallow the FTCA's sweeping waiver of sovereign immunity." Duke reiterated Gaubert's holding that the task before the court was to discern if the decision or nondecision implicated the exercise of a policy judgment of a social, economic or political nature. Id. at 1411.
¶ 40. In this case, it is difficult for this Court to fathom how Von Houten's failure to put down dry sand involved a policy judgment of a social, political, or economic nature. The failure to put down dry sand did not necessitate a selection between alternative policy objectives, and, like driving an automobile in the course and scope of employment, could not have been based upon any government regulatory purpose. Therefore, the act is not susceptible to policy analysis. We find that USM is not protected by discretionary function immunity and that it is liable for Von Houten's negligence pursuant to the waiver of sovereign immunity codified at Mississippi Code Annotated section 11-46-5. Therefore, we reverse and remand this case for a trial limited to the issue of damages.
¶ 41. THE JUDGMENT OF THE CIRCUIT COURT OF FORREST COUNTY IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.