# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01636-COA

**DELIAH COLYER, AS NATURAL MOTHER AND NEXT FRIEND OF MARSHUAN BRAXTON, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES OF MARSHUAN BRAXTON, DECEASED**                    APPELLANT

v.

**FIRST UNITED METHODIST CHURCH OF NEW ALBANY AND JOHN DOES 1-15**                    APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2014 |
| TRIAL JUDGE: | HON. ROBERT WILLIAM ELLIOTT |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOSHUA A. TURNER |
| ATTORNEYS FOR APPELLEES: | WILTON V. BYARS III |
| | JOSEPH LUKE BENEDICT |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| TRIAL COURT DISPOSITION: | SUMMARY JUDGMENT GRANTED TO APPELLEES |
| DISPOSITION: | REVERSED AND REMANDED - 03/29/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND JAMES, JJ.**

**JAMES, J., FOR THE COURT:**

¶1.    This case arises out of a wrongful-death action filed by Deliah Colyer on behalf of her deceased son, Marshuan Braxton. The trial court granted summary judgment in favor of First United Methodist Church of New Albany. On appeal, Colyer argues that the trial court erred by granting summary judgment. Finding error, we reverse and remand this case for a trial.

**FACTS**

¶2.    On June 20, 2009, Braxton, along with other minors and adult chaperones, flew from Memphis, Tennessee, to Costa Rica on a mission trip. Braxton, a seventeen-year-old, was expecting to begin his senior year at New Albany High School when classes resumed for the 2009-2010 school year. The purpose of the mission trip was to construct a sanctuary in Villa Briceno, Costa Rica, and conduct other mission activities. The trip was led by Amanda Gordon, associate pastor of First United Methodist Church of New Albany, Mississippi (FUNA). Amanda coordinated the trip with missionary Wil Bailey through the regional United Methodist missions group. There were fifteen members on the mission trip from FUNA, with nine adults and six minors. Five other individuals, four adults and one minor, from First United Methodist Church of Brandon, Mississippi, also joined.

¶3.    Before leaving for the mission trip, Elnora Howell, Braxton's legal guardian and grandmother, signed two documents before a notary public as a condition of Braxton participating. These documents included a New Albany First United Methodist Church Youth Medical / Parent Consent form and a Parental Consent form. Braxton also signed a document entitled "Int. Missionary Profile and Release of Claim" that contained warnings about the dangers associated with participating in the mission trip.

¶4.    The group arrived in San Isidro, Costa Rica, on June 20. On June 21, 2009, the group left San Isidro to travel to the worksite in Villa Briceno. Since they expected to ride on the bus for several hours, Bailey suggested they stop for lunch at a scenic site on their way to Villa Briceno. The group stopped and ate at a roadside café. After leaving the café, they stopped at the Dominicalito, a beach, located near the Pacific Ocean. The weather was clear,

and there were a few picnic tables in the area. A few locals were also there. The group intended to go on a brief excursion and take photographs. The bus driver suggested two or three areas on the beach for the group to visit.

¶5.    The group separated into two or three smaller groups and headed to the suggested areas. Braxton, Mattie Carter, and Josh Creekmore, along with adult chaperones, Sam Creekmore and Mike Carter, went to a rock formation and climbed onto it to observe crabs. The adults eventually climbed down and walked behind the rock formation. Braxton, Mattie, and Josh stayed up top and continued to observe the crabs. While Braxton, Mattie, and Josh were still up top, a large wave crashed into the rock formation and knocked them into the ocean.

¶6.    Mike and Sam immediately climbed back on the rock formation and saw Braxton, Mattie, and Josh swimming with their heads above water. The wave current, however, began to wash the minors away from the rock formation. Sam instructed them to swim around the rocks into an inlet area to reach safety on the beach. Mike climbed down closer to the water level. A second wave rose and knocked Mike into the ocean, and the current took him in the opposite direction of Braxton, Mattie, and Josh. Mike was eventually rescued by a local Costa Rican resident that had a life jacket and rope. Braxton, unfortunately, disappeared into the water before Mike was rescued. Mattie and Josh, however, were able to swim out onto the beach after being in the water for about five minutes.

¶7.    Adam Gordon and his wife, Amanda, went to a different area of the beach, but because of the distance and obstructions blocking their view they were unable to see the

minors. Adam testified that he was knocked down by a wave at the same time that the wave reached the area where Braxton, Josh, and Mattie were located. Amanda was standing nearby and saw the wave approaching Adam. Amanda yelled to her husband and then saw the wave knock him down. According to the Gordons, only one or two minutes passed before they had turned the corner of the taller rock formation and could see the rock wHere Braxton had been located. And it was at that time that they saw Mattie and Josh getting out of the water and Mike being rescued. However, according to Josh, fifteen to twenty minutes passed between Adam being knocked down by the large wave and the minors being swept into the water by another large wave.

¶8. The mission-trip members immediately began to seek help after seeing people on the beach reacting and in the water. The locals contacted emergency services by telephone, and residents in the area helped. The ambulance and local authorities arrived. Thereafter, everyone at the beach began to look for Braxton. The mission-trip group stayed on the beach for over three hours after the incident until darkness ended their search. Regrettably, Braxton's body was found the next day and identified by Amanda, Adam, and Sam.

**PROCEDURAL HISTORY**

¶9. The complaint was filed on November 10, 2011, in the Circuit Court of Union County, Mississippi. FUNA filed its answer and defenses on March 16, 2012, and, after conducting discovery, filed it motion for summary judgment on March 5, 2014. A hearing was held on April 28, 2014, and resulted in the circuit court granting Colyer's request for additional time to conduct discovery. Colyer conducted additional discovery and depositions followed by

4

the parties providing supplemental briefing. Another hearing was held on September 16, 2014. After considering all of the sworn evidence and the arguments of counsel, the circuit court found that no genuine issue of material fact existed to support Colyer's claims of negligence. The circuit court entered an order granting FUNA's motion for summary judgment on September 23, 2014.

## STANDARD OF REVIEW

¶10. We review the trial court's grant or denial of summary judgment under a de novo standard. *Moss Point Sch. Dist. v. Stennis*, 132 So. 3d 1047, 1049-50 (¶10) (Miss. 2014).

> Summary judgment is appropriate and shall be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Importantly, the party opposing summary judgment may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, will be entered against him.

*Karpinsky v. Am. Nat'l Ins.,* 109 So. 3d 84, 88 (¶10) (Miss. 2013) (internal citations and quotation marks omitted). "[T]he evidence must be viewed in the light most favorable to the party against whom the motion has been made." *One S. Inc. v. Hollowell*, 963 So. 2d 1156, 1160 (¶6) (Miss. 2007).

> **I.      The trial court erred by granting summary judgment, as genuine issues of material fact existed.**

¶11. Colyer alleges that FUNA was negligent and FUNA owed a duty to supervise Braxton while the group was on the mission trip. FUNA's position is that no negligence existed and that summary judgment was proper. The elements of a prima facie case of negligence are

5

duty, breach, causation, and damages. *Grisham v. John Q. Long V.F.W. Post*, No. 4057 *Inc.*, 519 So. 2d 413, 416 (Miss. 1988); *Burnham v. Tabb*, 508 So. 2d 1072, 1074 (Miss. 1987). Colyer contends that FUNA owed a duty to Braxton to provide ordinary care while supervising him during this trip. Colyer alleges that the duty was breached, and that the negligent acts or omissions of FUNA caused the death of Braxton.

¶12. FUNA agrees that a duty was owed to supervise Braxton, but FUNA contends that Braxton's age at the time of his death diminishes that duty. Nevertheless, our supreme court has held that adequacy of supervision is a question for the jury. *Summers v. St. Andrew's Episcopal Sch.,* 759 So. 2d 1203, 1215 (¶¶48-50) (Miss. 2000); *see also James v. Gloversville Enlarged Sch. Dist.*, 548 N.Y.S.2d 87, 88-89 (N.Y. App. Div. 1989). Therefore, regardless of Braxton's age, a jury must decide what constitutes proper and adequate supervision. *See Todd v. First Baptist Church of W. Point*, 993 So. 2d 827, 829 (¶12) (Miss. 2008).

¶13. There are also disputed facts regarding whether it was reasonable to expect Amanda to give Braxton warning after she witnessed her husband being knocked down by a wave. And we have determined that "[c]ontradictory statements by a witness go to the weight and credibility of that witness['s] testimony, not its sufficiency, and a summary judgment motion does not place the trial court in the role of weighing testimony and determining the credibility of witnesses." *Jamison v. Barnes*, 8 So. 3d 238, 245 (¶17) (Miss. Ct. App. 2008) (citation omitted).

¶14. Additionally, Colyer alleges other acts of negligence: (1) failure to research the

6

dangers of the Pacific coast and (2) allowing the children, including Braxton, to go onto a dangerous rock structure on the coast of the Pacific Ocean without any knowledge of oceanic activities in Costa Rica.

¶15. We conclude that there are genuine issues of material fact as to whether FUNA provided ordinary care while supervising Braxton during this trip, and so we reverse the grant of summary judgment.

## II. The trial court erred in granting summary judgment by considering the waivers of Howell and Braxton.

¶16. Even though Colyer raised this issue, it does not appear that the judge considered the waiver. In his opinion, the judge stated:

> [The plaintiff] claims that the defendant is liable for the wrongful death of Marshuan Braxton, who die[d] from drowning during a mission trip to Costa Rica on June 21, 2009. Viewing the facts in a light most favorable to the plaintiff, the court finds no genuine issues of material fact exist[ ] to support [the] plaintiff's claim of negligence against the defendant. Therefore, this Court finds as a matter of law [the] defendant's motion to dismiss shall be granted.

¶17. FUNA admits that it does not appear that the court relied on the release. However, FUNA states that the waivers are valid and bar recovery. It is undisputed that the parties in this appeal are not the same parties that executed the waivers. It appears that one of the waivers was signed by Howell, who was Braxton's grandmother. She signed a "parental consent form," but she is not a party to this action. Braxton, a seventeen-year-old minor at the time, appeared to have signed the release waiver.

¶18. Pursuant to Mississippi Code Annotated section 93-19-13 (Rev. 2013), Braxton could

7

not legally sign a contract of this nature to waive liability.[1]  Braxton's contract was not legally binding because of his age and the nature of the contract.  FUNA also alleges that the wrongful-death beneficiaries are bound by the contract of Braxton since they are third-party beneficiaries of Braxton's contract.  "[O]rdinary contract principals require a meeting of the minds between the parties in order for agreements to be valid."  *Am. Heritage Life Ins. v. Lang*, 321 F.3d 533, 538 (5th Cir. 2003) (internal quotations and citations omitted).  A contract cannot bind a nonparty.  *E.E.O.C. v. Waffle House Inc.,* 534 U.S. 279, 308 (2002).

¶19.    The two waivers executed in this case are not binding on Colyer and the trial court was correct in not giving any effect to these two waivers in its opinion.

## CONCLUSION

¶20.    There is sufficient evidence before this Court to show that genuine issues of material fact exist as to whether FUNA's supervision was negligent.  Therefore, the trial court's grant of summary judgment is reversed, and this case is remanded for a trial.

¶21.  **THE JUDGMENT OF THE UNION COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR A TRIAL.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.**

**LEE, C.J., IRVING, P.J., BARNES AND FAIR, JJ., CONCUR.  WILSON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.  CARLTON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., BARNES AND FAIR, JJ.; WILSON, J., JOINS IN PART.**

---

[1] "All persons eighteen (18) years of age or older, if not otherwise disqualified, or prohibited by law, shall have the capacity to enter into binding contractual relationships affecting personal property. Nothing in this section shall be construed to affect any contracts entered into prior to July 1, 1976.  In any legal action founded on a contract entered into by a person eighteen (18) years of age or older, the said person may sue in his own name as an adult and be sued in his own name as an adult and be served with process as an adult."  *See also Garrett v. Gay*, 394 So. 2d 321, 322 (Miss. 1981).

**GRIFFIS, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. ISHEE AND GREENLEE, JJ., NOT PARTICIPATING.**

**CARLTON, J., SPECIALLY CONCURRING:**

¶22. I specially concur with the majority's opinion in this case, and I write specially to address the material questions of fact raised herein. With respect to the negligence claims raised, the question as to whether a duty to warn arose from the relationship between the parties constitutes a question of law. *See Pritchard v. Von Houten*, 960 So. 2d 568, 579 (¶27) (Miss. Ct. App. 2007). Questions of law are reviewed de novo. *Id*. at 576 (¶20). However, the questions as to causation and foreseeability include material questions of fact.

¶23. In this case, a duty clearly arose from the relationship between Braxton, a seventeen-year-old minor, and Amanda, the associate pastor and leader of FUNA's youth mission trip. At the very least, FUNA, by and through its employee, Amanda, bore a duty to use ordinary care to plan and supervise this international mission trip composed of church members to Costa Rica and its shores on the Pacific Ocean. As the facts of this case reflect, a duty also arose and existed to supervise Braxton on the rock formations of the Costa Rica Pacific coastline. Accordingly, I find that genuine issues of material fact exist as to whether FUNA, through its employee, Amanda, negligently failed to warn of dangerous conditions that she knew or should have known existed on the beaches of Costa Rica's Pacific Ocean edge, and whether Amanda, as the mission-trip leader, negligently planned and supervised this international mission trip. *See Garrett v. Nw. Miss. Junior Coll.*, 674 So. 2d 1, 3 (Miss.

9

1996).[2]

¶24.    In *Pritchard*, 960 So. 2d at 579 (¶27),[3] we recognized that "[a]n important component of the existence of a duty is that the injury is reasonably foreseeable."  The *Pritchard* court further explained:

> A defendant charged with a duty to exercise ordinary care must only take reasonable measures to remove or protect against foreseeable hazards that he knows about or should know about in the exercise of due care.  Such a defendant must safeguard against reasonable probabilities, and is not charged with foreseeing all occurrences, even though such occurrences are within the range of possibility.  A defendant whose conduct is reasonable in light of the foreseeable risks will not be found liable for negligence.

*Id*. at (¶29) (internal citations and quotation marks omitted); *see also Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 175 (¶48) (Miss. 1999).  While duty constitutes an issue of law, causation is generally a question of fact for the jury.  *Brown v. State Farm Fire & Cas. Co.*, No. 06-CV-199, 2007 WL 1657417, at *4 (S.D. Miss. June 4, 2007).

¶25.    In *Foster ex rel. Foster v. Bass*, 575 So. 2d 967, 972 (Miss. 1990), the supreme court stated that "in order to recover for an injury to a person or property, by reason of negligence or want of due care, there must be shown to exist some obligation or duty toward the plaintiff which the defendant has left undischarged or unfulfilled."  Issues of fact as to foreseeability

---

[2] In *Garrett*, 674 So. 2d at 3, the Mississippi Supreme Court relied upon *Roberts v. Robertson County Board of Education*, 692 S.W.2d 863, 870 (Tenn. Ct. App. 1985), where the Tennessee Court of Appeals imposed a duty of care upon a high-school vocational teacher "to take those precautions that any ordinarily reasonable and prudent person would take to protect his shop students from the unreasonable risk of injury."

[3] The court in *Pritchard* , 960 So. 2d at 579 (¶27), found that a vocational teacher "has the duty to take those precautions that any ordinary reasonable and prudent person would take to protect his shop students from the unreasonable risk of injury."

10

and breach of duty preclude summary judgment. *See Summers ex rel. Dawson v. St. Andrew's Episcopal Sch. Inc.*, 759 So. 2d 1203, 1214 (¶¶48-51) (Miss. 2000) (reversing summary judgment on negligent-supervision claim because issues of fact as to foreseeability existed).

¶26.    In this case, the record reflects that Amanda served as both the associate minister and youth minister at FUNA.  Amanda testified that she was responsible for planning the trip to Costa Rica and that she recruited others to participate in this international mission trip.  She provided that she had led youth mission trips before and had traveled with youth groups internationally before.  Amanda testified that she had consulted with team leaders from another church who had traveled to Costa Rica on youth mission trips, but she admitted to failing to check with the United States State Department online travel advisory warnings, or any other travel advisories, as to any unsafe beach, tide, or surf conditions in Costa Rica.  She also admitted to not instructing or warning Braxton or any other youth about beach safety or about the dangerous surf or riptides of Coast Rica's Pacific Coast.[4]

¶27.    Geographically, Costa Rica sits between the Carribean Sea and the Pacific Ocean. The record reflects that the youth group was on the Pacific Ocean side of Costa Rica, and that Braxton and other members of the mission team began climbing on volcanic-rock formations that were separated from the shore by shallow water.  Braxton and Josh climbed on and over the rock formation to the Pacific Ocean side, and then they climbed down by the Pacific Ocean's edge, where they saw some crabs.  While watching the crabs, waves from the Pacific

---

[4] *Compare Rygg v. Cty. of Maui*, 98 F. Supp. 2d 1129, 1132-33 (D. Haw. 1999).

11

Ocean knocked Braxton and Josh off of the rock formation, into the ocean, and into the current of the dangerous riptides. Josh explained that the waves knocked them into different currents.

¶28. Regarding the traumatic events, Josh testified that he was standing on the rock formation with Braxton when a wave knocked them off of the rock and into the water. Josh testified that two more waves hit them as they tried to climb back onto the rock. Josh recalled getting pushed back under water after the second wave hit. When he came back to the surface, Braxton was grabbing his back, and the water had pushed the two of them close enough to the rock that they had fallen off of that they could try to climb back up. When the water from the wave subsided, they slid back down into the water, and Josh and Braxton then became separated by different currents. Josh testified that he was pushed into a current separate from Braxton, taking them in different directions. Josh recalled looking back and watching Braxton climb onto a smaller rock. When a third wave hit them, he and Braxton went under water again, and when he came back up, he could no longer see Braxton. Josh testified that prior to the trip, no one warned him of unsafe tide, surf, waves, or other conditions existing on the Pacific Ocean coast of Costa Rica. He also testified that he brought a swim suit with him on the trip.

¶29. The record contains pictures of the location where Braxton was knocked off of the volcanic-rock formation and into the Pacific Ocean. Josh described the top of the rock that he and Braxton climbed on as twenty feet high above the water, and stated that he and Braxton were on the ocean side of the formation, ten feet from the top, when the wave swept

12

them off. Josh provided that water completely surrounded the rock on all sides, separating the rock from dry sand by approximately thirty to forty feet of ankle-deep water on one side. Josh explained that the water was deeper on the ocean side of the rock where he and Braxton were knocked in the water.

¶30. Josh testified that he recalled Adam, a grown man who weighed approximately 340 pounds, slipping into the water before the wave hit him and Braxton. Adam testified that he was knocked down by a seven-to-eight-foot wave. Josh recalled that Adam was swept into the water about fifteen to twenty minutes before a different wave swept him and Braxton into the ocean.

¶31. The record reflects existing material questions of fact as to whether the church, through its mission-trip leader and employee, Amanda, negligently breached its duty to Braxton, a minor, to plan and supervise this international mission trip and to warn Braxton of the dangerous beach and surf conditions on Costa Rica's Pacific coast. Therefore, the trial court erred in granting summary judgment since triable issues of material fact exist in this case. In planning and supervising this trip, a duty existed to warn of the hidden dangers and perils not in plain view that FUNA and its mission trip leader, Amanda, knew, or should have known, existed. Additionally, once the tide rose and the large waves knocked the adults down, Amanda bore a duty to supervise and warn Braxton of the dangerous conditions.

¶32. The trial court's decision failed to address the Youth Medical/Parental Consent form waivers or their applicability in this case. However, the enforceability of the waivers was argued on appeal, and I write briefly to address this issue. Jurisprudence reflects that the

13

preinjury waivers herein are unenforceable with respect to the negligence claims for wrongful death raised in this case against the church for its negligence in planning, supervising, and failing to warn of the dangerous beach and ocean conditions on this mission trip to Costa Rica. *See Ghane v. Mid-S. Inst. of Self Def. Shooting Inc.*, 137 So. 3d 212, 221-22 (¶23) (Miss. 2014). The language in the waivers in this case applied to church-mission-related activities and related risks. The waivers contained no language regarding the liability or risks of recreational activities such as hiking, swimming, or rock climbing on Costa Rica's beaches on the Pacific Ocean or the risks of the dangerous riptides and dangerous ocean surf. Public policy prohibits the use of preinjury waivers of liability for personal injury due to future acts of a defendant's own negligence. *See Turnbough v. Ladner*, 754 So. 2d 467, 469 (¶8) (Miss. 1999) (waiver unenforceable where it did not express intent of student to accept any heightened exposure to injury caused by malfeasance of instructor's failure to follow safety guidelines); *Rice v. Am. Skiing Co.*, No. CIV.A.CV-99-06, 2000 WL 33677027, at *2 (Me. Super. Ct. May 8, 2000). For a waiver to be valid and enforceable, it must not be ambiguous and it must be specific in wording as to the liability. *See Turnbough*, 754 So. 2d at 469 (¶8). Waivers will be strictly construed against the defendant. *Id*. When a waiver contains ambiguous language, it cannot be construed as a waiver of liability for injuries that result from the negligence of the defendant. *Id*. at 470 (¶9).

¶33. As stated, the evidence in the record reflects material questions of fact exist as to foreseeability and breach of duty for negligent failure to plan and supervise the mission trip

14

and failure to warn of the dangerous beach and surf conditions of Costa Rica's Pacific coast.[5]

Therefore, summary judgment must be reversed and the case remanded.

**LEE, C.J., BARNES AND FAIR, JJ., JOIN THIS OPINION. WILSON, J., JOINS THIS OPINION IN PART.**

---

[5] *Compare Diamond Crystal Salt Co. v. Thielman*, 395 F.2d 62, 65 (5th Cir. 1968) (plaintiff was injured on a guided tour of a mine where "the danger was not obvious, and if the dangerous condition had in fact been observed it would not have been appreciated by persons of ordinary understanding")*; see also Martinez v. United States*, 780 F.2d 525, 527 (5th Cir. 1986) (duty to warn at shallow swimming area of federal park); *Wyatt v. Rosewood Hotels & Resorts LLC*, No. 2004-12, 2005 WL 1706134, at *4-5 (D.V.I. July 19, 2005).