IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 2, 2015, at Jackson

**STATE OF TENNESSEE v. KENNETH RYAN MALLADY**

**Appeal from the Circuit Court for Hickman County**
No.   04-5035C           Timothy L. Easter and Robbie T. Beal, Judges

**No. M2014-01664-CCA-R3-CD – Filed July 29, 2015**

In this procedurally complex case, in 2006, a trial court found the Defendant, Kenneth Ryan Mallady, not guilty by reason of insanity for the offenses of first degree premeditated murder, attempted first degree premeditated murder, and aggravated assault. The judge ordered that the Defendant be transported to Middle Tennessee Mental Health Institute ("MTMHI").   The Defendant was subsequently discharged from MTMHI with the requirement that he participate in mandatory outpatient treatment.   In 2012, the trial court found that the Defendant had not complied with his mandatory treatment plan, appointed him counsel, and ordered him temporarily recommitted to MTMHI.   In 2014, the trial court held a hearing and ordered that he be permanently recommitted to MTMHI. The Defendant appeals his permanent recommitment, contending that the trial court applied the incorrect legal standard when making its findings.   After a thorough review of the record and relevant authorities, we conclude that the record supports the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined.   ROBERT L. HOLLOWAY, JR., J., not participating.

William G. Brown, Nashville, Tennessee, for the appellant, Kenneth Ryan Mallady.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Kim R. Helper, District Attorney General; and Michael J. Fahey, II, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

    This case arises from the Defendant killing his mother and seriously injuring his stepfather in September 2003.   The judgments of conviction, entered November 30,

2006, show that after a bench trial the trial court found the Defendant not guilty by reason of insanity of premeditated first degree murder, attempted premeditated murder, and aggravated assault. The trial court ordered that he be transported to MTMHI for involuntary commitment.

In April 2010, the chief executive officer at MTMHI notified the trial court of her intent to furlough the Defendant and discharge him under a mandatory outpatient treatment ("MOT") program, pursuant to Tennessee Code Annotated section 33-6-708(1) (2007). *See State v. Kenneth Ryan Mallady*, No. M2010-02142-CCA-R3-CD, 2012 WL 76901, at *1 (Tenn. Crim. App., at Nashville, Jan. 10, 2012), *no Tenn. R. App. P. 11 application filed*. The Defendant's furlough and outpatient treatment began on April 29, 2010. *Id.* The State filed a motion requesting the trial court review the Defendant's release to outpatient treatment. *Id.* After a hearing on the motion, the trial court reversed the decision to discharge the Defendant to MOT. *Id.* at *3. The trial court found that, while the Defendant had progressed over his four years at MTMHI, he still posed a "substantial likelihood of serious harm." The trial court stated:

> This was . . . an egregious act, and I think the Court would really be shirking its responsibilities if I didn't at least pay some heed . . . to why we're here to begin with . . . . I also think we have to pay some heed to the fact that it ha[s]n't even been four years . . . . [F]our years is not a significant amount of time in which to recover from an illness that would cause someone to act the way he did on an occasion . . . when he killed one person and attempted to kill another.

*Id.* at *4. The trial court then expressed concern over potential problems with the Defendant's medication. *Id.* at *5. It acknowledged that the medication had worked well for several years and that "there is structure [in the outpatient program] to make sure he continues to take medication." *Id.* The trial court, however, did not believe that the medication had proven to be a long-term remedy for the Defendant's mental health problems and expressed concern over the administration of proper doses. *Id.* The trial court also stated that "there's nothing that would prohibit [the Defendant] at this point from simply just becoming tired of the structure . . . [and] the rules" and leaving. *Id.* The trial court concluded, "I am not able to say right now today based upon this very limited period of time, this almost four years . . ., that I think the placement recommended by your doctors are [sic] appropriate." *Id.* The Defendant appealed the trial court's judgment to this Court.

On appeal, this Court reversed the trial court's judgment and remanded the case for entry of an order, pursuant to Tennessee Code Annotated section 33-6-708(c)(4), discharging the Defendant from involuntary commitment under the terms of the MOT program recommended by the MTMHI chief officer. *Id.* at *8. We recognized the

2

trial court's concern for public safety in its hesitation to discharge the Defendant to outpatient treatment, but we held that the statutory scheme reflected the considered judgment of the state legislature regarding the proper balance between the need to protect the public from the person while at the same time protecting the person from unjustified detention. *Id.* (citing *State v. Janice Floyd*, No. W2000-02236-CCA-R3-CD, 2001 WL 846046, at *5 (Tenn. Crim. App., at Jackson, July 20, 2001), *no Tenn. R. App. P. 11 application filed*.

On August 9, 2012, the State filed a petition for an emergency order directing the Defendant's temporary recommitment to MTMHI. The State alleged that the Defendant was not in compliance with the terms and conditions of his MOT. It further stated that the MTMHI forensic director had stated that the Defendant's whereabouts were unknown. The State said that it had information that proved that the Defendant had been released from the Metropolitan Nashville jail on July 27, 2012, and that he did not return to "Safe Entry, Ann's Care Home," where his treatment required that he reside, or to MTMHI.

To its petition, the State attached the affidavit of Joyce N. Harris, who was the Defendant's treating mental health professional. She stated:

> On 7/27/12 Mr. Kelvin Talley, group home supervisor, reported that [the Defendant] left his group home on 7/26/2012 without permission. Mr. Tally reported calling police to report [the Defendant] missing and he was advised that [the Defendant] was in police custody for attempting to shoplift beer at a convenience store and that he was currently in the hospital due to injuries sustained in a struggle with the store clerk.

Also attached to the petition was Ms. Harris's letter to the Assistant District Attorney in charge of prosecuting this case. In it she explained:

> I have enclosed an affidavit regarding [Mandatory Outpatient Treatment ("MOT")] noncompliance for [the Defendant]. As you know, [the Defendant] was discharged from MTMHI on March 15, 2012 to Safe Entry for MOT supervision. Prior to discharge, he participated in day treatment at Safe Entry for two years and lived in the 24 hour supervised group home of Mr. Kelvin Talley. Since his discharge date, [the Defendant] has continued to live in the Talley home, participate in day treatment and receive psychiatric services. He has been consistent, compliant and stable until a very recent change as indicated by the report that follows that was received from Mr. Kelvin Talley on this date.
>
> I was contacted by Mr. Talley on this date and informed that on

3

Thursday, July 26, 2012, he was notified by a group home supervisor that after dinner at the group home, [the Defendant] was not in a designated "smoke area" for all group home residents as appropriate. Mr. Talley stated that, after searching the neighborhood, he contacted police on that same day to report [the Defendant] missing. Mr. Talley reported being told by the police that [the Defendant] was in the hospital and in police custody after attempting to shoplift beer at a local convenience store. Reportedly, the hospitalization was due to minor injuries [the Defendant] sustained in an altercation with the convenience store clerk. As of this date, reportedly, [the Defendant] is in the hospital but will be transferred to jail upon release from the hospital due to warrants related to the July 26, 2012, reported incident.

On August 8, 2012, the trial court granted the State's petition, and it ordered that the Defendant be temporarily recommitted to MTMHI. It found:

> This matter is based on the Petition of the State of Tennessee and the attached affidavit of Joyce Harris of Safe Entry pursuant to Tenn. Code Ann. Section 33-6-609. In that regard, the Court finds as follows:
>
> [The Defendant] is required to participate in mandatory outpatient treatment under Tenn. Code Ann. Section 33-6-602;
>
> [The Defendant] is, without good cause, out of compliance with the treatment plan;
>
> Given that the present whereabouts of [the Defendant] is unknown, the Court has reason to believe that the noncompliance is not likely to be corrected voluntarily.
>
> IT IS, THEREFORE, ORDERED that:
>
> [The Defendant] shall immediately be arrested, and turned over to the custody of the Sheriff of Hickman County, Tennessee;
>
> The Sheriff shall immediately thereafter transport [the Defendant] to MTMHI;
>
> MTMHI shall temporarily admit [the Defendant] and give notice under Tenn. Code Ann. Section 33-6-611(5) of the temporary recommitment and that a hearing under Tenn. Code Ann. Section 33-6-610 will be held.

4

On August 24, 2012, the State filed a petition for a hearing to determine the Defendant's compliance with the terms and conditions of MOT pursuant to Tennessee Code Annotated section 33-6-610. On August 27, 2012, the trial court entered an order in which he appointed the Defendant an attorney and ordered that a hearing date be set.

At the July 29, 2014 hearing, the following evidence was presented: Bill Regan, a staff psychiatrist at MTMHI, testified as an expert in the field of forensic psychiatry. He testified that he had reviewed the Defendant's file, spoken with a number of his previous psychiatrists, and evaluated him personally.

Dr. Regan testified that the Defendant's file contained a treatment contract signed by the Defendant for his MOT. The contract represented the treatment recommendations that the treatment team had made with regard to the Defendant's MOT, and Dr. Regan testified that the Defendant had not complied with the contract. Dr. Regan explained that for the fourteen to sixteen months before the Defendant's release to MOT, doctors allowed him to go to Ann's Care Home, where he was eventually discharged, for short periods of time. The Defendant would then return to MTMHI, be assessed, and, after several successful outings, it was decided that he was ready to be discharged. Dr. Regan said that, within four months of his discharge, the Defendant began drinking alcohol, which violated the recommendations of his contract. The Defendant also "walked off from the group home" and "did not follow through with his medication and appointments." The Defendant ultimately was arrested for attempted robbery and theft. He was released from jail on bond and "disappeared" for eleven days. Dr. Regan said that the Defendant informed him that he walked to Marshall County on his own. He told the doctor that he would "bum food" and "bum money" from "people."

Dr. Regan testified that the Defendant was confronted by a park ranger at Henry Horton State Park. It was alleged that the Defendant threatened to kill the park ranger. Upon this basis, the trial court found that the Defendant was in violation of his MOT and the Defendant was returned to the hospital.

Dr. Regan testified that, since being readmitted to the hospital in August 2012, the Defendant had engaged in three separate incidents of violence. The doctor said that, in September 2012, the Defendant had "an altercation in the group therapy room, where he ultimately threw a chair at the group leader and later made threats to kill the group leader." The doctor said that, in January 2013, he had a "verbal altercation with another patient and that again led to a physical attack." Most recently, in December 2013, the Defendant "had another altercation which again [the Defendant] started verbally attacking [another person] and he wound up hitting the guy in the face . . . so hard he broke . . . his hand."

5

Dr. Regan testified that the Defendant was "very intelligent," "present[ed] himself very well," is a "participant in the work force," and "enjoys art." Dr. Regan said that the problem with the Defendant was that, when the Defendant was granted "any sort of latitude with any sort of freedom," it led to his being "quick to . . . get angry" and to "act out." The doctor noted the Defendant's failure on MOT and instigation of violent incidents in the hospital.

Dr. Regan said that, based on his evaluation, he prepared for the Defendant a "Certificate of Need." He agreed that the Defendant currently had a mental health illness or serious emotional disturbance and that he posed a substantial likelihood of serious harm to himself or others because of this illness or disturbance. Dr. Regan opined that MOT was not "suitable at this time" and that the Defendant needed "continued inpatient treatment." In support of this, Dr. Regan noted the Defendant's violent episodes, even while hospitalized. He noted that the Defendant "quickly deteriorated" while discharged to the community. He cited that the Defendant began using alcohol, stopped taking his medication, and committed criminal offenses. The doctor opined that there were no less drastic alternatives than hospitalization for treatment.

Dr. Regan identified a "Certificate of Commitment" that was created by Dr. M.S. Jahan, who was the clinical director of MTMHI, on July 25, 2014. Dr. Regan said that Dr. Jahan's findings were substantially similar to the opinions that Dr. Regan had expressed.

The State offered certified copies of convictions entered against the Defendant on January 10, 2013, showing that he pleaded guilty to assault and theft of property valued under $500.

During cross-examination, Dr. Regan testified that the Defendant's mental illness was "in partial remission." The doctor noted that the Defendant was "monitored carefully to make sure he t[ook] his medication" and was living in "a very structured setting." Dr. Regan said that the homes similar to the one that housed the Defendant did not have the authority to force its residents to take their prescribed medication and that it must be taken by the residents voluntarily. Dr. Regan testified that the Defendant had been compliant in taking his medication for the last six months. Dr. Regan said that the Defendant also participated in a hospital program where he had been given janitorial duties and that he had "done well in that program."

Dr. Regan said that the Defendant had not acted violently while conducting his janitorial duties or while participating in art therapy. He said, however, that the Defendant had acted violently during his group therapy.

6

Dr. Regan acknowledged the Defendant's allegation that his group home supervisor had provided him with alcohol. He said, however, that the group home supervisor denied this allegation. Dr. Regan agreed that the Defendant's alcohol use may have been a factor in his behavior while on MOT. Dr. Regan said that the Defendant had expressed to him that he knew that he "blew" a big opportunity when he failed to follow the provisions of MOT.

Randall Ward, the Sheriff of Hickman County, testified that the District Attorney's Office contacted him in August 2012 seeking his help to locate the Defendant. The Sheriff testified that he was later notified by a park ranger in Marshall County that they had detained the Defendant. Sheriff Ward sent deputies to retrieve the Defendant and return him to Hickman County.

The Defendant testified that he understood the opportunity that he had missed by using alcohol and violating his MOT. He said that he had been at MTMHI for two years and had been utilizing the programs there in hopes of being discharged again under MOT. He said that he was working with doctors to maybe incorporate "Antabuse," a drug designed to discourage alcohol consumption. He acknowledged that he was an alcoholic in addition to his other mental health illnesses. He said that he no longer needed the restrictive environment of the hospital because he did not have an acute mental illness.

The Defendant said that he took multiple medicines, including an anti-psychotic, an anti-depressant, a pain reliever, and a sleep aid, and that he could continue to take those medications if released to MOT. The Defendant said that he never again wanted to be psychotic, and he expressed an understanding that if he used alcohol his medications would not be effective. The Defendant said that he would resist alcohol and drugs if allowed to return to MOT. The Defendant said that the manager of the group home had given him $20 and told him to go to the liquor store and purchase her whiskey and himself a beer.

The Defendant explained the violent episodes while hospitalized, stating that the hospital is a "very aggressive environment." He said that the people housed there are "severe[ly] mentally ill." The Defendant said that in order to function in that environment, he had to defend himself when the hospital technicians failed to protect him. The Defendant said that he would like to move on with his life and have some normalcy. He stated that he realized that sobriety was a part of that, as well as taking his medications.

Ms. Lynn Butler testified by proffer that she was the art teacher at MTMHI and that the Defendant was very involved in her art classes. She said that the Defendant was

7

prompt and timely and took great pride in assisting with the art classes. She did not find the Defendant to be aggressive or violent in her class.

Based upon this evidence, the trial court found:

[The Court] has had occasion to have a hearing with [the Defendant]. [The Defendant] has always come across, at least in my Court, as being respectful and courteous. I agree with Dr. Regan's analysis. He's well spoken and he clearly communicates with the Court. He tells the Court and he has enough judgment to be able to advise the Court of what the Court wants to hear. That he's . . . progressing in his treatment and that he intends to successfully complete the treatment.

And again, that's all good stuff and the Court appreciates that testimony. When this originally came for his release to an outpatient treatment program, I think ultimately the Court of Appeals . . . issued that he should attend the outpatient treatment program, this Court may have had some reservations just due to the nature of the offense that placed him in the program.

I don't believe that there is any dispute as to the fact that he was out of compliance with outpatient treatment program. He clearly committed some offenses, some criminal offenses, while on the program. And then for lack of a better word absconded, so to speak. At that point, which of course was a violation as well. Clearly he used alcohol which in and of itself is a violation and became noncompliant with his medicine.

[The Defendant] states that all of this, that really the root cause of all of this was his issue with alcohol and that in fact, a lot of this came down because [the Defendant] was not able to attend his AA meetings as he had been used to. Once again, the Court sympathizes with that position. Certainly, [the Defendant] is not the only one that's found himself in legal problems because of his alcohol use. There's twenty people in this Courtroom today that could probably say the same thing.

But on the same token, the problem that [the Defendant] has is that he is under such strict rules and the prior offense was so significant that any violation he has doesn't really warrant many more second chances. And again, he's acknowledged that.

The Court believes again, it is easy to state, and I think there's even agreement to it, he was out of compliance with outpatient treatment program.

8

The Court accepts Dr. Regan's testimony here today and the Certificate of Need that was presented as an Exhibit that in fact they are wary that he would not be able to put himself in compliance without the hospitalization that he's been participating in. The doctors have stated clearly and this certificate may further, that they don't believe that he is capable at this point, with all due respect to [the Defendant], of voluntarily correcting his behavior to the point of being able to adhere to the rules of the outpatient treatment program.

It is clear that [the Defendant] continues to suffer from his mental illness, although the Court accepts his testimony as well [as] the doctor's testimony, but his testimony primarily, that he is conscious of his mental illness; that he wants to correct it; and that he is taking steps to correct it. The problem is though, is that the mental illness still appears to be substantial enough that would -- that would cause him to pose a substantial risk of harm to both himself and to others.

Based upon this, the Court believes that the Certificate of Need is appropriate, that its recommendations that he continue in the care of MTMHI is appropriate and obviously continue in the inpatient program involuntarily.

The Court does believe that there are no less restrictive alternatives available. Quite frankly, that's what the outpatient treatment program was and that didn't go well. So, there are no less restrictive alternatives available. By this -- by this Order, by this recommitment, to MTMHI the Court is not taking away, I don't think I have the authority to take away the doctor's discretion, that if and when [the Defendant] is able to be trusted to take his medicine, to avoid alcohol, to utilize his judgment in staying on top of his own treatment, that he can reapply for an outpatient treatment program.

Again, I don't mean to make that a pie in the sky kind of goal, but as long as -- as long as he continues to have the attitude he has displayed in this Court then he would continue to at least have that option. But ultimately today the Court believes that Dr. Regan's recommendations are appropriate.

On July 29, 2014, the trial court entered a written order. In it, the trial court noted that the State had asked it to find that the Defendant had violated the terms of his MOT and to recommit the Defendant permanently to MTMHI. The trial court found:

On July 26, 2012, [the Defendant] violated the terms of his . . . [MOT] by committing two crimes in Davidson County, Assault and Theft, as shown by the certified copies of the judgments. [The Defendant] also

violated the terms of his MOT by failing to return to the group home, and remaining at large until his apprehension by law enforcement on August 9, 2012 in Marshall County, TN. As such, the Court reiterates its finding entered August 8, 2012, that [the Defendant] has violated the terms of his MOT, and shall be permanently recommitted to the secure facility at MTMHI.

Further, based on the testimony of Dr. Bill Regan, and the Certificate of Need of Dr. M.S. Jahan, the Court also finds as follows:

(a) [The Defendant] was out of compliance with the MOT without good cause, cannot be immediately put in compliance with the MOT, and cannot be expected to stay in compliance without further hospitalization; and the medical professionals believe the non-compliance is not likely to be corrected voluntarily;

(b) [The Defendant] suffers from a mental illness or serious emotional disturbance, due to which he poses a substantial likelihood of serious harm to himself and others, and there is a likelihood harm will occur unless he remains under involuntary inpatient psychiatric treatment;

(c) Due to [the Defendant's] mental illness or serious emotional disturbance, he needs the care, training, and treatment available to an involuntary psychiatric inpatient in the custody of the Tennessee Department of Mental Health at MTMHI; and

(d) There are no suitable less restrictive alternatives.

IT IS, THEREFORE, ORDERED that

(1) [The Defendant shall remain committed to the custody of the Commissioner of the Department of Mental Health at MTMHI for treatment.

(2) This Court shall retain jurisdiction over this case pursuant to Tenn. Code Ann. Section 33-6-708.

(3) The costs of these proceedings and a reasonable attorney fee shall be assessed to the State of Tennessee in accordance with Tenn. Code Ann. Section 33-3-503.

(4) The Clerk shall provide a copy of this Order to the Chief Executive Officer of MTMHI.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it ordered commitment at MTMHI instead of returning him to MOT. He states that the record indicates that he could "be put immediately in compliance with the treatment plan and could be expected to stay in compliance with the treatment plan without further hospitalization," citing Tennessee Code Annotated section 33-6-601(c). The Defendant asserts that the record preponderates against the trial court's decision to "permanently recommit him to MTMHI." The State counters that the trial court properly used the correct legal standard when it determined that the Defendant should remain committed to MTMHI and that the record does not preponderate against its ruling.

Preliminarily, we note that we must first determine whether this Court has jurisdiction to hear this case, a threshold determination that we are obligated to make in every case. *See* Tenn. Rule App. P. 13(b). A question exists about whether the trial court's ordering the Defendant to be recommitted permanently after failing MOT, as mandated by Tennessee Code Annotated section 33-6-610, falls within our jurisdiction. The order follows a finding of "not guilty" and is not a "final judgment" in a criminal case. The order, however, necessarily occurs within a case or proceeding "instituted with reference to or arising out of a criminal case" for which we are specifically invested with review authority. T.C.A. § 16-5-108(a)(2) (2009).

Further supporting our right to review, we note that, after the statutory period of evaluation, an insanity acquittee is entitled to a hearing in the original trial court to determine if commitment or further treatment is warranted and that appellate review of that determination is by our Court. *See* T.C.A. § 33-7-303(b)(1) and (d) (2007). This Court has previously held that, given these aforementioned reasons, "it is only practical to assume that we have jurisdiction, as well, to review the trial court's initial hospitalization order." *State v. Phillips*, 968 S.W.2d 874, 877 (Tenn. Crim. App. 1996) (stating that the case should have been appealed pursuant to Tennessee Rule of Appellate Procedure 9 or 10 but suspending the appellate rules to hear the case on its merits). Finally, when a defendant requests a hearing about his continued commitment pursuant to Tennessee Code Annotated section 33-6-708, the trial court's judgment is considered a "final judgment" and appealable to this Court pursuant to section 33-6-708(c)(5). *See* T.C.A. § 33-6-708 (c)(5) (stating "The district attorney general on behalf of the state or the person may file a notice of appeal of a final adjudication under this section to the court of criminal appeals."). By way of extension, we conclude that we have jurisdiction to review the trial court's order of re-hospitalization after unsuccessful MOT pursuant to Tennessee Code Annotated section 33-6-610. In any case, the State lodges no objection to our jurisdiction in this case, and good cause exists for us to suspend the appellate rules, if such would be required, in order that the case may be resolved upon its merits. *See* Tenn. R. App. P. 2. Accordingly, we turn to address the Defendant's issue on appeal.

The Defendant contends that the record indicates that he could "be put immediately in compliance with the treatment plan and could be expected to stay in compliance with the treatment plan without further hospitalization," citing Tennessee Code Annotated section 33-6-601(c). Preliminarily, we note that involuntary commitment is civil in nature and thus, our standard of review is de novo upon the record of the trial court with a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *see State v. Groves*, 745 S.W.2d 843, 844 (Tenn. Crim. App. 1987) (applying this standard to involuntary commitment pursuant to Tennessee Code Annotated section 33-6-104). This standard has been interpreted to mean that the appellate court will affirm the trial court's decision "unless an error of law affecting the result has been committed or unless the evidence preponderates against the trial court's findings of fact." *Id.* (citing *Roberts v. Robertson County Board of Education*, 692 S.W.2d 863, 865 (Tenn. Ct. App. 1985)). The trial court's resolution of disputed evidence and conflicts in testimony requiring a determination of the credibility of witnesses is binding on this Court unless there is other real evidence to the contrary. *Id.* (citing *State ex rel. Balsinger v. Town of Madisonville*, 222 Tenn. 272, 435 S.W.2d 803, 807 (1968) and *Roberts*, 692 S.W.2d at 865).

As background to address the case under submission, a person found not guilty by reason of insanity and ordered to involuntary commitment may be eligible for discharge to outpatient treatment. T.C.A. § 33-6-708(a). Outpatient treatment is available when doctors determine that the patient's mental illness is in remission but that continued treatment is necessary. T.CA. § 33-6-602(1)(A), (B). Tennessee Code Annotated section 33-6-601 governs the hearing and findings after a person's failed discharge to outpatient treatment. It states:

> (a) If the person appears in person before the court, the court shall hold a hearing to determine whether the person is required to be participating in outpatient treatment and is, without good cause, not complying with the treatment plan.

> (b) The court shall release the person, if the court determines that:

>> (1) The person is complying with the treatment plan; or
>> (2) The person is out of compliance for good cause and will be restored to compliance without further action.

> (c) If the court determines that the person is out of compliance with the treatment plan without good cause and that the person can be put immediately in compliance with the treatment plan and can be expected to

stay in compliance without further hospitalization, the court shall make written findings of fact and conclusions of law on the issues, order the person to comply immediately with the treatment plan, and dismiss the proceedings upon a showing that the person is in compliance.

(d)(1) The court shall make written findings of fact and conclusions of law on the issues and order the person re-committed to the hospital from which the person was released, if the court determines that the person is out of compliance with the treatment plan without good cause and that:

(A) The person cannot be put in compliance with the treatment plan immediately; or

(B) The person cannot be expected to stay in compliance without further hospitalization.

(2) The sheriff shall immediately transport the person as ordered, and the hospital shall admit the person and give notice of the recommitment to the person's attorney, legal guardian, legal custodian, conservator, and spouse or nearest adult relative, to the qualified mental health professional, to the committing court, and, if the discharge was under § 33-6-708, to the district attorney general in the committing jurisdiction.

T.C.A. § 33-6-601.  In the case where the patient's suitability for outpatient treatment is based upon Tennessee Code Annotated section 33-6-708, the chief hospital officer's determination about the patient's eligibility for release from commitment has a rebuttable presumption of correctness.  T.C.A. § 33-6-708(c)(1).

In this case, the trial court made the appropriate findings pursuant to this section and concluded that the State had proven that the Defendant's continued hospitalization was warranted.  The trial court based its findings in part upon the fact that, when the Defendant was released to MOT, he began drinking and then committed an assault and theft, crimes to which he pleaded guilty.  Further, that he essentially "absconded" by not reporting to his group home and leaving Hickman County.  Dr. Regan testified that the Defendant had shown improvement in some areas in the two years between his re-hospitalization and the hearing, but Dr. Regan opined that the Defendant was not ready to be returned to MOT and that there were no less restrictive alternatives to hospitalization.  He noted that the Defendant had been involved in violent episodes even while hospitalized during those two years.  A Certificate of Need from MTMHI's clinical director, Dr. Jahan, confirmed Dr. Regan's opinion.  The trial court followed the

13

doctors' recommendation.

We conclude that the State offered clear, unequivocal, and convincing evidence that the Defendant's continued hospitalization was necessary. The less restrictive alternative is MOT, and the Defendant was not successful when placed on MOT. We recognize the Defendant's commitment to sobriety, which is in Dr. Regan's opinion, a key to his success, along with his commitment to taking his medication necessary to avoid psychosis, but we also place great stock in the opinion of his treatment providers. Those providers are of the opinion that the Defendant is not ready to be placed on MOT at this time. We agree with the trial court that: (1) the Defendant was out of compliance with his MOT and that his non-compliance is not likely to be corrected voluntarily; (2) the Defendant suffers from a mental illness or serious emotional disturbance, he poses a substantial likelihood of serious harm to himself and others, and there is a likelihood harm will occur unless he remains under involuntary inpatient psychiatric treatment; (3) due to the Defendant's mental illness or serious emotional disturbance, he needs the care, training, and treatment available to an involuntary psychiatric inpatient in the custody of the Tennessee Department of Mental Health at MTMHI; and (4) there are no suitable less restrictive alternatives. The Defendant is not entitled to relief.

We note that the Defendant can be determined eligible for discharge again pursuant to Tennessee Code Annotated sections 33-6-602 and -617. He further maintains his right to file a motion pursuant to Tennessee Code Annotated section 33-6-708 to ensure that his continued hospitalization is warranted

## II. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE